RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0134p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

    *v.*

ANTHONY DOUGLAS GRAHAM,

       *Defendant-Appellant.*

No. 05-4566

>

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 03-00139—Walter H. Rice, District Judge.

Argued: March 14, 2007

Decided and Filed: April 12, 2007

Before: MARTIN and CLAY, Circuit Judges; POLSTER, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Joseph A. Almeida, Steubenville, Ohio, for Appellant. Anne H. Fehrman, ASSISTANT UNITED STATES ATTORNEY, Dayton, Ohio, for Appellee. **ON BRIEF:** Joseph A. Almeida, Steubenville, Ohio, for Appellant. Anne H. Fehrman, ASSISTANT UNITED STATES ATTORNEY, Dayton, Ohio, for Appellee.

---

**OPINION**

---

    BOYCE F. MARTIN, JR., Circuit Judge. Defendant Anthony Graham was charged with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The firearm upon which this prosecution was based was found during a *Terry* search by an officer of the Dayton Police Department. Graham argues that this firearm, as well as statements made after its seizure, should be suppressed because the officer did not possess reasonable suspicion to conduct the search. For the reasons below, we affirm the district court's denial of Graham's motion to suppress.

---

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

# I

The district court made the following findings of fact:

> At approximately 7:50 p.m., on September 13, 2003, Officers Ryan Halburnt ("Halburnt") and Christopher Malson ("Malson") of the Dayton Police Department were traveling on Grand Avenue in their cruiser, when they noticed a Pontiac Grand Am parked illegally outside 1701 West Grand Avenue. The driver's door of that vehicle was open. Halburnt and Malson got out of their cruiser and approached the illegally parked Pontiac Grand Am. Halburnt could see that a male was sitting in the driver's seat, with a female sitting in the passenger's seat. As he approached the car, Halburnt saw the Defendant dip his shoulder, as if he were putting something under the seat.
>
> When he neared the driver's door of the Pontiac Grand Am, Halburnt asked the Defendant whether he knew that the car was illegally parked and to put his hands on the steering wheel. Halburnt also asked him for identification. In response, the Defendant denied that he was aware that the car was illegally parked and said that he had no identification. He indicated, however, that he was Tony Graham. That name meant something to Halburnt, because, earlier that evening, Officer Craig Stivers ("Stivers") had broadcast over the radio information to the effect that it was possible that Tony Graham was armed and was planning to shoot someone at 1701 West Grand Avenue. As a consequence, Halburnt asked the Defendant to get out of the Pontiac Grand Am, a request with which Graham complied.
>
> After the Defendant had gotten out of the car, he and Halburnt walked back to the police cruiser, which was parked about ten feet behind the Pontiac Grand Am. When they got to the back of the cruiser, Halburnt told the Defendant that he (Halburnt) was going to pat him (Graham) down and that the Defendant would have to sit in the back of the cruiser. The Defendant refused to be frisked and to get into the cruiser. Graham then began to walk away. At that point, Halburnt and Malson attempted to grab the Defendant, but he persisted in walking away and struggled to prevent them from grabbing him. As he was doing so, the Defendant told the officers that he was not going to get into the cruiser or let them pat him down. As the Defendant continued to resist, Halburnt sprayed him briefly with pepper spray. As a consequence, Defendant immediately complied, and the officers were able to handcuff him, pat him down and place him in their cruiser.[1]
>
> After the Defendant had been secured in the backseat of the cruiser, Halburnt returned to the Pontiac Grand Am and looked under the driver's seat, where the Defendant had been seated when he had dipped his shoulder as if he were placing something under his seat. From under that seat, Halburnt seized the firearm which serves as the basis for this prosecution.
>
> Subsequently, Halburnt returned to the cruiser in which the Defendant was seated and read him the *Miranda* warnings. The Defendant indicated that he understood his rights and that he was willing to speak with Halburnt. In response to the officer's question, the Defendant said that he kept the firearm for protection.

D. Ct. Order, Mar. 12, 2004, at 2-4; D. Ct. Order, Aug. 19, 2004, at 2-3.

On October 28, 2003, Graham was indicted by a federal grand jury for violating 18 U.S.C. § 922(g)(1). He subsequently filed a motion to suppress any statements he had made and evidence

---

[1]No weapons were found as a result of the pat down. Graham was cuffed and placed in the cruiser solely for the purpose of officer safety. At this point, he was not under arrest, nor was he Mirandized.

seized during his detention.  At a hearing held on December 15, 2003, Halburnt was the only person who testified.  On March 12, 2004, the district court requested additional briefing on issues raised by the motion to suppress, which it was still considering.  D. Ct. Order, Mar. 12, 2004, at 1-7.**2**  Each party filed a brief in response to this request.

On August 19, 2004, the district court denied Graham's motion to suppress.  Because the government did not come forth with evidence establishing the reliability of Stivers' statement, the court conducted its analysis as if the tip had been anonymous.  D. Ct. Order, Aug. 19, 2004, at 11. The district court looked to the Supreme Court's decision in *Alabama v. White*, 496 U.S. 325, 329 (1990), which held that although an anonymous informant's tip that a suspect was carrying cocaine was in and of itself insufficient to justify a *Terry* stop, once the police observed the suspect act as the tip predicted, reasonable suspicion was established.  The district court concluded that "Stivers' radio broadcast contained information which predicted Graham's future behavior, to wit: that he would be at 1701 West Grand Avenue.  That prediction proved to be accurate, given that the Defendant was found at that address."  D. Ct. Order, Aug. 19, 2004, at 12.  Further, the court noted that the fact that the suspect's name was Tony Graham proved the accuracy of the predictive information, because the informant was aware of Graham's activities.  *Id*.  The district court ultimately found that this tip, when paired with the Graham's dipping motion, was sufficient to establish reasonable suspicion that Graham was armed and dangerous, and therefore, the search did not violate Graham's Fourth Amendment rights.  *Id*. at 14.

Graham pled guilty to violating 18 U.S.C. § 922(g)(1), reserving his right to appeal the district court's denial of his motion to suppress.  Graham was sentenced to forty-eight months' imprisonment, to be followed by three years of supervised release.  He now appeals.

## II

Graham first argues that the officers did not have probable cause to stop him for a parking violation.  He further contends that even if the stop was lawful, the searches of his person and the vehicle were not supported by reasonable suspicion, and thus, the firearm discovered during the search is inadmissible.  When reviewing a district court's denial of a motion to suppress, we review factual findings for clear error and legal conclusions *de novo*, and view the evidence in the light most favorable to the district court's conclusion.  *United States v. Jones*, 159 F.3d 969, 973 (6th Cir. 1998).  "With regard to *Terry*-stop analysis in particular, although the standard of review on the ultimate reasonable suspicion inquiry is *de novo*, the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination.  Accordingly, 'due weight' should be given to the inferences drawn from the facts by 'resident judges.'"  *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006) (internal quotation marks, citations, and alterations omitted).

---

**2**Specifically, the district court expressed its concern that "the Government did not present any evidence concerning the source of Stivers' information."  D. Ct. Order, Mar. 12, 2004, at 6.  Noting that it was the government's burden to establish that reasonable suspicion existed, *see Florida v. Royer*, 460 U.S. 491, 500 (1983), the district court ordered the parties to provide further briefing on the following questions:

> (1)  "If the source of Stivers' information was an anonymous tip, must the Court then ignore that information because the Government has failed to establish the veracity or reliability of Stivers' information?";
>
> (2)  "If so, did the illegally parked car and Defendant's furtive movement establish reasonable suspicion?";
>
> (3)  "Alternatively, assuming that *Florida v. J.L.* was violated, may the Court nevertheless consider the information provided by Stivers, along with the parking violation and the Defendant's furtive movements, when determining whether reasonable suspicion existed?"

D. Ct. Order, Mar. 12, 2004, at 6.

## III

### A

Before explaining our reasons for affirming the district court, we must briefly dispose of one of the arguments that the government has brought before this Court. The government contends that we need not analyze the broadcasted tip under *Florida v. J.L.*, 529 U.S. 266, 270-72 (2000) (holding that an anonymous caller's bare-bones tip that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun, without more, was insufficient to justify an officer's stop and frisk of the man).[3] In support of its argument, the government seizes upon the following language contained at the end of the majority opinion in *J.L.*:

> Finally, the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with *Terry*, to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue.

*J.L.*, 529 U.S. at 274. The government interprets the reference to a "person who has already been legitimately stopped" to mean that because the initial encounter with Graham was pursuant to a lawful traffic stop unrelated to the broadcast, and only later during the stop did the broadcast become relevant, *J.L.* should not impact our reasoning.

We do not read the cautionary language in *J.L.* as broadly as the government does. The government's argument suggests that once an individual is legitimately stopped, for any reason, police who receive an otherwise unreliable tip have carte blanche to perform a protective search of the person (or his effects). As we read *J.L.*, however, "a person who has already been legitimately stopped," refers to a person who was already lawfully stopped for the same reasons that serve as the basis for the protective search. That is not the case here, where Graham was seized for an independent and unrelated purpose. There clearly must be some nexus between the criminal conduct of which the police suspect the defendant and the aim of the protective search — the most obvious example arising where they suspect him of illegally carrying a gun. It is hard to imagine how suspicion of a parking violation, by itself, could ever justify a protective search of a suspect's person. While the officers here were completely within their rights to carry out their duties related to the parking violation, with respect to investigating any *other* crimes, they were bound by the same constitutional limitations that they would have been had they encountered Graham while he was doing nothing illegal at all.

The Supreme Court has *never* authorized a protective search on anything less than reasonable suspicion that a suspect was armed and dangerous. Although courts have generally applied *J.L.* (and *White*) to cases involving stops rather than searches, it is obvious that before an officer searches an individual, the officer must overcome the same evidentiary threshold that he must overcome when he stops an individual. Therefore, when acting on an anonymous tip, the same indicia of reliability required for a *Terry* stop are also required for a *Terry* search. Had the officers' suspicion been based *solely* on a tip as unreliable and unpredictive as the tip in *J.L.*, we would not hesitate to hold that the district court erred when it denied Graham's motion to suppress the fruits of the protective search.[4]

---

[3] We presume that the government would also contend that the Supreme Court's other seminal anonymous tip case, *Alabama v. White*, 496 U.S. 325 (1990), would also not apply.

[4] We do note, however, that because we find that the tip contained predictive information similar to the tip in *Alabama v. White* (explained below), we need not apply *Florida v. J.L.* Here, we simply wish to state that the inapplicability of *J.L.* has to do with the fact that the tip should be analyzed under *White*, not the fact that the search

The unfounded proposition that *J.L.* is inapplicable when an individual is stopped for a traffic violation was originally presented to us in the government's brief as one ground for affirmance. Then, at oral argument, the Assistant United States Attorney repeatedly used this argument in an apparent attempt to avoid discussing the reliability of the tip.  Given the strength of the government's case under our current interpretation of the reasonable suspicion doctrine (explained below), we see this as an unnecessary, uphill battle, and are left to speculate that the government's position is aimed less at winning this case than at further limiting the Fourth Amendment to benefit the prosecution in future cases.  Whatever its motivation, we decline the government's invitation to craft law that would run afoul of the Fourth Amendment.

**B**

Graham first challenges the district court's conclusion that there was probable cause to seize him for committing a parking violation.  Resolution of this issue is important, for if the officers lacked probable cause to investigate the parked vehicle in the first place, then all subsequent actions by the officers were tainted, rendering the gun and Graham's statement inadmissible under the "fruit of the poisonous tree" doctrine. *United States v. Pino*, 855 F.2d 357, 361 n.5 (6th Cir. 1988) (citing *Wong Sun v. United States*, 371 U.S. 471, 487 (1963)).

At the suppression hearing, Halburnt testified that he and Malson had observed a Pontiac Grand Am in a no-parking zone with the driver's door open.  He stated that the car was parked approximately ten or fifteen feet in front of a sign indicating that parking was not allowed. Ultimately, the female in the passenger seat, who owned the Grand Am, was issued a parking citation.  D. Ct. Order, Mar. 12, 2004, at 4 n.3.

"This Court has held that 'so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment.'" *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1991) (en banc)); *see also Whren v. United States*, 517 U.S. 806, 810 (1996).  While Graham does not take issue with this proposition, he contends that the officers did not have probable cause to justify the stop and that more importantly, at the suppression hearing, Halburnt did not identify an ordinance or statute to show that a violation had occurred.  However, the City of Dayton does have an ordinance prohibiting parking where signs do not allow stopping, and Graham was clearly in violation of this ordinance.[5]  Halburnt need not have cited to a particular ordinance or statute while testifying; it was enough for him to state that there was a sign explicitly prohibiting parking where Graham was parked.  Further, Halburnt issued a citation to the owner of the car, which presumably details the location of the parking violation.[6] This evidence indicates that Halburnt had probable cause to believe that Graham was violating a city ordinance.

Graham resists this conclusion by relying on our decision in *United States v. Goodwin*, No. 98-6415, 2000 U.S. App. LEXIS 570 (6th Cir. Jan. 12, 2000).  In *Goodwin*, the police officer testified that he had probable cause to stop the defendant's vehicle because it was blocking a public roadway. *Id*. at *7.  Although the district court noted that the officer "was not able to identify any

___

occurred after Graham was seized for a parking violation.

[5]     *See* Revised Code of General Ordinances for the City of Dayton, § 72(L), *available at* http://www.municode.com/resources/gateway.asp?pid=13723&sid=35%20 (prohibiting parking where signs do not allow stopping) (provided in Appellee's Br. at Attachment A).

[6] A copy of this citation is not in the record, but Graham does not dispute its existence.  At the suppression hearing, Halburnt stated that the parking ticket contained "an offense date, time, vehicle license plate and location."

local ordinance or Kentucky statute to support his contention that Defendant was engaged in a traffic violation at the time of the stop," and further, the officer failed to issue a traffic citation, it found that "blocking a roadway" was a "valid traffic violation." *Id.* On appeal, we found that the district court was clearly erroneous for crediting the officer's testimony and finding that he had probable cause to stop the vehicle. *Id.* at *7-8.

*Goodwin* is distinguishable. There, at the suppression hearing, the officer could not cite to any law prohibiting "blocking the roadway," and the record did not indicate what law had been broken. Further, no citation was issued. It appears that the *Goodwin* Court found probable cause lacking not so much because of what the officer witnessed (or failed to witness), but rather, because there did not appear to be an identifiable law which the defendant had violated. This led this Court to find that the officer's testimony was not credible. Here, in contrast, it is undisputed that stopping a vehicle where signs clearly prohibit parking is against Dayton City law. The fact that a citation was issued only bolsters Halburnt's contention that he believed Graham was violating the law by parking in a no-parking zone. As a result, the initial seizure of Graham was supported by probable cause.

## C

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that in limited circumstances, an officer may frisk an individual if the individual's conduct leads an officer to reasonably suspect that he is "armed and presently dangerous to the officer or to others." *Id.* at 24. Further, the Court has held that in some circumstances, officers who reasonably suspect that an individual is armed and dangerous may conduct a search of his vehicle:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21). In determining whether reasonable suspicion exists, courts employ a "totality of the circumstances" analysis. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). "This means that we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 9 (1989)). The question presented here is whether, given the facts and circumstances that arose once Graham was lawfully seized for a traffic violation, the officers had reasonable suspicion that criminal activity was afoot, thus justifying the frisk of Graham and the subsequent search of the vehicle.

### i. The *Terry* Frisk

In deciding whether the *Terry* frisk was lawful, we must determine whether the anonymous tip and the furtive movement observed by Halburnt, when considered together, support a reasonable suspicion that Graham was armed and dangerous. With respect to tips alone, the Supreme Court has held that an anonymous tip exhibiting sufficient indicia of reliability may support a showing of reasonable suspicion. *White*, 496 U.S. at 329-32. In *White*, police received an anonymous tip that the defendant would leave Building 235 at Lynwood Terrace Apartments at a particular time and in a particular car, and would arrive at Dobey's Motel while in possession of a brown attaché case

containing cocaine. *Id*. at 327. The Supreme Court found that this tip, standing alone, did not contain sufficient indicia of reliability to justify a *Terry* stop. *Id*. at 329. However, the Court held that once the officers observed the defendant behave as the tip predicted, they then possessed reasonable suspicion, allowing them to lawfully stop the defendant. *Id*. at 332 ("When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.").

The government argues that "the broadcast accurately predicted Graham's future behavior when it stated that 'Tony Graham' would be at 1701 West Grand Ave[nue]" and "[t]he accuracy of this predictive information in the broadcast was demonstrated when Halburnt learned Graham's name during the encounter." Appellee's Br. at 21. Graham, on the other hand, claims that the accuracy of the location does not qualify as future predictive behavior, and likens this to the *White* Court's observation that "the fact that the officers found a car precisely matching the caller's description in front of the 235 building" was an "easily obtained fact[] and condition[] existing at the time of the tip," that "[a]nyone could have 'predicted' . . . because it was a condition presumably existing at the time of the call." *White*, 496 U.S. at 332 (cited by Appellant's Br. at 22). It was only later that the tip became reliable because the anonymous caller's predictions came true (for example, the prediction of the defendant's future location), which "demonstrated inside information — a special familiarity with [defendant]'s affairs." *Id*.

In the case at bar, the tip relayed by Stivers earlier in the evening did not relate to "a condition presumably existing at the time of the [tip]." *Id*. Rather, it was a tip that Tony Graham was armed and planning to shoot someone at that address, which was corroborated once Halburnt approached the vehicle parked at that address and learned that the occupant's name was Tony Graham. Despite the fact that some of the tip's predictions were verified, we decline to hold that this tip *alone* was enough to justify the search. *Cf. id*. at 332 (noting that "*significant* aspects of the caller's predictions were verified") (emphasis added). The *White* tip contained many more predictions, which were later confirmed, such as the location and time of the suspect's departure and arrival, the type of car she would be driving, and the fact she would be carrying a brown attaché case. However, we need not rely merely on the tip to decide this case. In addition to the tip, the district court credited Halburnt's testimony that before he approached the vehicle, he observed Graham dip with his right shoulder toward the floor as if he was placing something under his seat. This type of furtive movement is consistent with an attempt to conceal a firearm. *See Caruthers*, 458 F.3d at 466 ("Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions."); *United States v. Edmonds*, 240 F.3d 55, 61 (D.C. Cir. 2001) (finding that an officer's observation of the defendant ducking and reaching under his seat and then sitting up after the officer made his presence known could be considered in a totality of the circumstances analysis). We find that Halburnt's observation of Graham reaching under the seat, when considered in conjunction with the tip that Graham would be at that location and armed, created the requisite reasonable suspicion to justify the *Terry* frisk.

### ii. The Vehicle Search

As noted above, if an officer possesses a reasonable suspicion that a suspect is armed and dangerous, he may conduct a brief protective sweep of the suspect's vehicle, so long as that search is constrained to places where a weapon may be hidden. *Long*, 463 U.S. at 1049. Given that the officers were already reasonably suspicious that Graham was armed based on the tip and the furtive movement combined, thus justifying a *Terry* frisk, it follows as a matter of course under *Long* that they also could lawfully conduct a protective search of the car. The fact that the frisk revealed no weapons did not extinguish the officers' suspicion — particularly in light of the fact that Halburnt saw Graham dip, which he could have interpreted as Graham placing something under his seat. Even if Graham did not have the gun on his person, it was reasonable for the officers to believe that upon reentering the vehicle, Graham would have had immediate access to a gun. *Id*. at 1048-50.

The above edict from *Long* notwithstanding, Graham argues that because he was cuffed and secured in the back of the cruiser, with five to seven officers guarding him, it was unreasonable for the officers to search the car, for the gun was not within his immediate control. However, at this point, Graham was merely detained, but not under arrest. Had the officers not searched the car and simply let him go, Graham would immediately have had access to the weapon once he reentered the car. *See id.* at 1052 ("[I]f the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside."). Graham's reliance on the Fourth Circuit's language in *United States v. Holmes*, 376 F.3d 270 (4th Cir. 2004), is entirely misplaced. Although the *Holmes* Court stated that there was "no reasonable possibility" that the cuffed suspects in the back of the police cruiser could access the interior of Holmes' car while detained, the Court explained that "it was well within the range of reason to believe that, *after their release at the conclusion of the stop*, the suspects would have access to the interior of their car." *Id.* at 279 (emphasis added).

Graham also argues that the tip was unreliable because Halburnt received it from another officer, rather than a face-to-face encounter with the informant. First, it should be noted that the district court credited the government's contention that this tip came from a victim of threats who spoke to Stivers. Further, the fact that Halburnt received the tip via a broadcast made by another officer does not in and of itself make the tip unreliable. Police officers are permitted to rely upon tips from fellow officers. *See United States v. Hensley*, 469 U.S. 221, 230-33 (1985); *Whiteley v. Warden*, 401 U.S. 560, 568 (1971). Assuming that Halburnt and Malson objectively relied on the radio broadcast, any evidence seized during the search of Graham is admissible if the officer who actually issued the broadcast—Stivers—had reasonable suspicion justifying the search. *See Hensley*, 469 U.S. at 233.[7]

## IV

Combined, the anonymous tip and Graham's dip gave the officers reasonable suspicion that Graham was armed and dangerous, thus permitting Halburnt's frisk of Graham and search under his car seat. Therefore, the district court's denial of Graham's motion to suppress is affirmed.

---

[7] We wish to note our skepticism regarding the veracity of Halburnt and Stivers. It seems more than convenient that immediately after Halburnt approached the vehicle and learned Graham's name, he recalled this earlier tip. After all, what prevents an officer from claiming that he "heard a tip" whenever he needs to justify a search of an individual? Our skepticism is heightened by the fact that the government did not call Stivers to testify, even though he allegedly received the tip from the potential victim. There is no foundation in the record (such as a police log of broadcasts made) to support a finding that the tip existed. We are left only with the district court's belief, on the basis of Halburnt's testimony, that he did in fact hear a tip over the radio. Because such a finding is not clearly erroneous, and Graham does not argue that the tip did not exist, we must accept the district court's finding that Halburnt was credible. *Jones*, 159 F.3d at 973.