File Name:  07a0627n.06
Filed:  August 28, 2007

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No.  06-6007

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.                                                                          ON APPEAL FROM THE
                                                                            UNITED STATES DISTRICT
MAURICE BLACK,                                                COURT FOR THE EASTERN
                                                                            DISTRICT OF TENNESSEE

    Defendant-Appellant.

_____/

Before:        MARTIN, ROGERS, Circuit Judges; HOOD, District Judge.*

    BOYCE F. MARTIN, JR., Circuit Judge.  During a traffic stop on September 16, 2004, two

police officers discovered a firearm in a vehicle belonging to Maurice Black.  Following his arrest,

Black made incriminating statements to two ATF agents while being interrogated.  After the district

court denied Black's two motions to suppress—one concerning the evidence seized during the traffic

stop and the other concerning statements made during interrogation—Black pleaded guilty to being

a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  He preserved

his right to appeal the district court's denial of his suppression motions.  On appeal before this court,

Black argues that (1) he was unconstitutionally seized when a police officer conducting the stop took

---

    *The Honorable Denise Page Hood, United States District Judge for the Eastern District of
Michigan, sitting by designation.

his driver's license and walked away, (2) his car was illegally searched by an officer, and (3) the ATF

agents failed to Mirandize him before the interrogation. For the reasons that follow, we **AFFIRM**

the district court's orders denying Black's motions to suppress.

I.

The following testimony was elicited at Black's first suppression hearing before a magistrate

judge on December 7, 2004. This hearing concerned only the evidence seized at the crime scene.

In the early morning hours of September 16, 2004, two officers from the Knoxville Police

Department, Kevin Ragland and his field training officer, Ray Offenbacher, were patrolling what

Ragland described at the suppression hearing as a "high crime area" of Knoxville, Tennessee, that

was known for prostitution, drug crimes, gun crimes, and "crimes against persons." While driving

through a park, Officers Ragland and Offenbacher noticed a car with its driver's side door open

parked on a public road in a parking spot cut out from the road. Ragland, who was driving the police

cruiser, stopped behind the vehicle and turned on the cruiser's high beams (but not the emergency

lights), at which point he "noticed movement toward the back seat" which looked to him as if

"somebody was placing something in the back seat, hiding something." Ragland testified that he

believed the car was parked illegally because the park was closed at the time.[1] When asked why he

pulled up behind the car, Ragland explained that it was dark outside, the park was closed, and cars

parked in that area at night without lights on tended to belong to drivers engaged in criminal activity.

---

[1]Black contends that, in fact, he was not illegally parked, noting the lack of "No Parking" signs or postings of park hours, and the fact that other cars were parked on the side of the road in a nearby residential area. Appellant's Br. 8. However, because we find that Black has forfeited the right to contest the officers' initial approach of his vehicle, *see infra* note 3, even if the car was legally parked, it is of no consequence.

Ragland and Offenbacher stepped out of the cruiser and approached the parked car. Ragland introduced himself to Black, who was sitting in the driver's seat, and asked Black whether he knew that the park was closed and why he was in the park so late. As he was speaking to Black, Ragland "noticed a tremendous odor of alcoholic beverage coming from the inside of the car." Black explained that he and his girlfriend, the car's passenger, had gotten into an argument that evening and had come to the park to "cool down." Ragland testified that at this point he was investigating Black for driving under the influence.

As Black reached for his car keys, which were in the ignition, Ragland asked Black and his girlfriend for their driver's licenses. After taking the licenses back with him to the cruiser to check police records, Ragland discovered that Black's license had been suspended. Ragland testified that at this point he was also investigating Black for driving on a suspended license.

Ragland walked back to the car and continued questioning Black about his purpose for being in the park, the source of the smell of alcohol, and whether Black knew that his license had been suspended. Finding Black's answers to be unsatisfactory, Ragland removed Black from the car to separate Black from his girlfriend for some "one-on-one" questioning. Ragland asked permission to pat down Black and asked him whether he had any weapons in his pockets. Ragland testified that in response to his questions, Black became "defensive[,] . . . annoyed[,] and irate." After Black calmed down, Ragland conducted a pat down, which revealed no weapons or contraband. Thereafter, Black admitted that his real reason for having parked along the road was to have sex with his girlfriend. However, Black denied having alcohol or any illegal items in the car. When Ragland

asked Black whether he could search the car, Black's girlfriend interjected, "do you have probable cause?" Offenbacher then removed Black's girlfriend from the car in order to talk to her.

As Offenbacher was speaking to Black's girlfriend, Black removed his shirt and placed it on the car, an action that the officers interpreted as preparation to attack them. Ragland asked Black to "back off a little bit," and again asked Black whether he had anything illegal in the car. This time, Black responded by pulling out a partly empty, unsealed bottle of Hennessy cognac. Black then stated, in response to a question by Ragland, that he had no other illegal items in the car.

Ragland testified that Offenbacher knew at that point, based on their time working together, that Ragland was going to arrest Black. Aware that an arrest was about to occur, Offenbacher began searching the car while Ragland talked with Black and his girlfriend, who were sitting on the curb. During the search, Offenbacher discovered a handgun under either a seat or seat cover. The officers then handcuffed Black and his girlfriend, and placed Black in the back of the cruiser.

The following day, two Special Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), James Clayton Claiborne and Fred Winston, interviewed Black at the Knox County Detention Facility. Both agents testified at Black's second suppression hearing, which was held before the magistrate judge on September 1, 2005. Claiborne and Winston testified that Winston read Black his *Miranda* rights and that Black agreed to speak with them. Black, on the other hand, testified that he was not read his rights. During the interview, Black told the agents that he received the gun from a friend and that his fingerprints were on the gun because he had handled it approximately one week before the interview.

On October 5, 2004, a grand jury indicted Black for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). On December 13, 2004, Black filed a motion to suppress "all physical evidence and statements acquired as a result of the seizure of his person on September 16, 2004."

On February 10, 2005, a magistrate judge issued a report recommending that the district court deny the motion to suppress the gun that Offenbacher discovered during his search of Black's car.[2] The magistrate judge concluded that Black was first seized within the meaning of the Fourth Amendment when Ragland took Black's driver's license with him back to his police cruiser. The magistrate judge concluded that Ragland had reasonable suspicion of criminal activity because of the following factors: (1) Black was present in a closed park at night, (2) Black was present in a "high-crime area," (3) Ragland saw "one of the two occupants [of the car] put something in the back seat as if to conceal the object," and (4) Ragland detected the odor of alcohol emanating from the car. Mag. J. Op., 2/10/05, at 18-21. The magistrate judge also concluded that Offenbacher's search of the car was lawful as a search incident to Black's proper arrest for driving on a suspended license and "possession of an open container of alcohol on a public street, park, or parking lot." Mag. J. Op., 2/10/05, at 22-24. On March 8, 2005, the magistrate judge's report and recommendation was adopted in whole by the district court.

---

[2]The magistrate judge also recommended that the district court suppress the statements that Black made to Ragland and Offenbacher at the arrest scene after Black was handcuffed because the statements "were made without the benefit of the *Miranda* warnings, despite [Black] being in custody." The government does not challenge that ruling.

On April 19, 2005, a grand jury issued a superseding indictment charging Black with the same felon in possession of a firearm count and, in addition, one count of knowingly possessing a stolen firearm, in violation of 18 U.S.C. § 922(j). On April 21, 2005, Black filed a second motion to suppress, arguing that the statements that he made to the ATF agents were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

On September 12, 2005, the magistrate judge issued a second report, recommending that the district court deny Black's motion to suppress statements that he made to the ATF agents. The magistrate judge found that the testimony of Agents Claiborne and Winston that Black had received *Miranda* warnings was credible, and that Black's testimony that he did not receive *Miranda* warnings was not credible. The magistrate judge also concluded that Black's statements were voluntary, and accordingly recommended that the district court deny Black's second motion to suppress. On October 12, 2005, this report and recommendation was accepted in whole by the district court.

On December 16, 2005, Black entered a conditional plea to the first count of the superseding indictment (felon in possession of a firearm), which permitted him to appeal the district court's denial of his motions to suppress. On July 24, 2006, the district court sentenced Black to 90 months' imprisonment. On July 31, 2006, Black filed a timely notice of appeal.

## II.

When reviewing a district court's denial of a motion to suppress, this court reviews factual findings for clear error and legal conclusions *de novo*, and considers the evidence in the light most

favorable to the district court's conclusion. *United States v. Jones*, 159 F.3d 969, 973 (6th Cir. 1998).

### A. Taking of Black's Driver's License

Black first argues that he was unconstitutionally seized when Ragland took his driver's license and walked back to the police cruiser.[3] The government, for the most part, acknowledges that Ragland seized Black, though claims that this seizure was lawful.

A person is seized within the meaning of the Fourth Amendment if during a police encounter, an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen," such that a person would not feel that he or she was free to leave. *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) (internal quotation marks and citation omitted). When a police officer takes a motorist's driver's license and walks away with it, no reasonable motorist would feel free to drive away, as this would require the motorist to either drive without a license or abandon his or her car. *Cf. Florida v. Royer*, 460 U.S. 491, 501-02 (1983) (holding that defendant was seized within the meaning of the Fourth Amendment when government agents took defendant's driver's license and plane ticket, asked defendant to accompany them to a room in the airport, and did not indicate

---

[3]We note that, under certain facts, Black may have a cognizable claim that he was unconstitutionally seized from the moment the officers pulled up behind his car. However, because this issue was, at best, "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," Black has forfeited any argument that he was seized before Ragland took his license. *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005). In fact, Black even appears to concede that this initial stop was legal. *See* Appellant's Br. 25 ("The officers, on routine patrol, **may have been within their rights** to stop and make sure that the occupants of the car were safe." (Emphasis added)); *id*. at 28 ("In Mr. Black's case, the officers did not even have a traffic violation to pursue. **They might have checked on the safety of the car's passengers, but then they should have left them alone to enjoy the evening**." (Emphasis added)).

to defendant that he was free to leave); *United States v. Mullins*, Nos. 93-6642, 94-5004, 1995 U.S. App. LEXIS 3135, at \*21 (6th Cir. Feb. 16, 1995) (finding that no seizure under the Fourth Amendment had occurred during a traffic stop where there was no indication that defendant's driver's license or registration had been taken and he and others had not been ordered to remain in the car).

We will uphold an officer's seizure of an individual if, considering the totality of the circumstances, *United States v. Cortez*, 449 U.S. 411, 417 (1981), "the officer is able to point to specific and articulable facts which give rise to a reasonable suspicion of criminal activity," *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006) (quoting *United States v. Hardnett*, 804 F.2d 353, 355-56 (6th Cir. 1986)). *See also Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Here, there were several facts that, when viewed in their totality, gave rise to reasonable suspicion. First and foremost, upon approaching the vehicle but prior to taking Black's license, Ragland smelled a strong odor of alcohol coming from the car. Tennessee law prohibits a person from driving or being "in physical control" of an automobile while under the influence of alcohol. *See* Tenn. Code Ann. § 55-10-401(a). A person may be convicted under this law if he is "found intoxicated either in or beside [a] parked vehicle and the circumstantial evidence strongly indicates that the defendant drove to the location in an intoxicated condition." *State v. Lawrence*, 849 S.W.2d 761, 763 (Tenn. 1993). The smell of the alcohol, when paired with Ragland's observation of Black in the driver's seat with the keys in the ignition, certainly gave rise to reasonable suspicion that Black was violating Tennessee law. In addition, the other background facts that Ragland observed—that Black was parked in a closed park at night in a high crime area and that one of the car's occupants placed something in the backseat as

the officers approached the car—bolstered Ragland's suspicion. *Cf.,United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) (finding that upon approaching a vehicle, an officer's observation of a car's occupant placing something under his seat may contribute to an officer's suspicion of criminal activity).

In response, Black attacks Ragland's credibility. For example, Black disputes that the area where he was parked was a "high crime area." He also questions Ragland's smelling of alcohol by noting that Ragland did not mention the strong smell of cigarettes, which Black maintains was present in the car; did not observe that Black "had slurred speech, bloodshot eyes, or was unsteady on his feet"; and did not administer field sobriety tests. Black also lists a number of factors which he apparently believes should have eliminated any suspicion: that Black and his girlfriend "were not hidden down a dark lane," "were sitting out in the open," and "were not being the least bit secretive"; that Ragland did not see "any crime being committed," did not see "an open container of alcohol," did not see or smell any illegal drugs, did not see any contraband, and did not observe "any activity that indicated the couple was engaged in prostitution"; and that Ragland observed that Black's license had not expired. Appellant's Br. 11, 18-19, 25. Although we must look to the totality of the circumstances in deciding whether reasonable suspicion existed, none of these factors negated Ragland's smelling an odor of alcohol coming from the car nor the other facts that formed the basis for his suspicion. The fact that Officer Ragland did not observe any telltale signs of inebriation or evidence of another crime does not alter the fact that Ragland's suspicion was reasonable. The magistrate judge's factual findings that Ragland believed Black to have been parked in a "high crime area" and that Ragland had noted the smell of alcohol, were not clearly erroneous. Because Ragland

had, at the very least, reasonable suspicion that criminal activity was afoot, his seizure of Black was lawful.

Black also argues that Ragland was unjustified in running a check on Black's driver's license, contending that "[n]othing in the record indicates a reasonable suspicion that Mr. Black had an expired or suspended license, or any outstanding warrants." Appellant's Br. 26-27. However, such routine driver's license checks have been upheld by this court as within the scope of a lawful traffic stop. *See, e.g., United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999) ("It is uncontested that in a valid traffic stop, an officer can request a driver's license, registration or rental papers, run a computer check thereon, and issue a citation."); *see also Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 186 (2004) ("Our decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops"). The license check in the instant case raises no concerns, as Black was being lawfully detained because he was under investigation for driving under the influence. Therefore, we hold that Ragland did not unjustifiably prolong the seizure by performing a routine check on Black's license.

## B. Search of Black's Vehicle

We also hold that Offenbacher's search of Black's car did not violate Black's Fourth Amendment rights, for this search was justified on two separate grounds: as a search incident to arrest and under the "automobile exception" to the Fourth Amendment's Warrant Clause.

The Supreme Court has explained that "when a [police officer] has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460 (1981).

Further, the search may precede a "formal arrest" so long as the officers had probable cause to arrest prior to the search and the arrest "followed quickly on the heels of the challenged search." *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *see also United States v. Montgomery*, 377 F.3d 582, 587-88 (6th Cir. 2004). Here, at the time that Offenbacher conducted the search, he and Ragland had (1) smelled a strong odor of alcohol coming from the vehicle; (2) discovered an unsealed, partly empty, bottle of alcohol in the car; and (3) learned that Black's license was suspended. The officers thus had probable cause to arrest Black for driving while intoxicated, possessing an open alcoholic beverage container in an automobile,[4] and driving with a suspended license. Furthermore, the record indicates that the officers handcuffed Black immediately after the gun was discovered in Black's car — in other words, little time elapsed between the officers' finding they had probable cause to arrest Black and their formal arrest of him. Therefore, Offenbacher's search of the car was justified as a search incident to Black's arrest.

Alternatively, Offenbacher's search of Black's car was proper under the "automobile exception" to the Fourth Amendment's Warrant Clause. Under this exception, first laid out in *Carroll v. United States*, 267 U.S. 132, 155-56 (1925), a warrantless search of an automobile is permissible if the search is supported by probable cause. *See also Maryland v. Dyson*, 527 U.S. 465,

---

[4]Tennessee law provides that "[n]o driver shall consume any alcoholic beverage or beer or possess an open container of alcoholic beverage or beer while operating a motor vehicle . . . ." Tenn. Code. Ann. § 55-10-416(a)(1). An "open container" is "any container containing alcoholic beverages or beer, the contents of which are immediately capable of being consumed or the seal of which has been broken." *Id*. § 55-10-416(a)(2)(A). Open containers are also prohibited by the Knoxville City Code, which provides that "[i]t shall be unlawful for any person to . . . [p]ossess an open container containing beer or alcoholic beverages, or consume beer or alcoholic beverages, on any public street, sidewalk, playground, school property, public park or recreational facility or public parking lot within the corporate limits of the city . . . ." Knoxville City Code § 4-1(b)(2).

466-67 (1999) (per curiam). Here, when Offenbacher searched Black's car, Ragland had already

smelled alcohol in the car and Black had retrieved an unsealed bottle of alcohol from the car. This

gave Offenbacher probable cause to believe that there was additional evidence of a violation of the

open container law (i.e., other bottles of alcohol) inside the car. Therefore, Offenbacher's search of

Black's car did not violate the Fourth Amendment.

### C. ATF Agents' Questioning of Black

Finally, we turn to Black's appeal of the district court's second order, denying his motion to

suppress statements he made to Agents Winston and Claiborne. Black argues that the agents did not

read him his *Miranda* warnings, noting that there was no mention of the warnings in the agents'

notes, no signed *Miranda* warning form, and no tape recording of the interrogation to prove that such

warnings were given. Appellant's Br. 30. At the suppression hearing, Claiborne testified that when

he and Winston met with Black, Winston read Black his *Miranda* rights.[5] Claiborne and Winston

both testified that although Black refused to sign an ATF rights-waiver form, Black stated that he

---

[5]These rights were read off of a "*Miranda* card," which stated the following warning:

> Before we ask you any questions you must understand you have the right to remain silent. Anything you say can be used against you in court. You have right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. Do you understand? Are you willing to answer some questions?

Winston testified that in response to the question, "Do you understand?", Black stated "Yes, I know my rights," and that in response to the question, "Are you willing to answer some questions?", Black stated "Yes."

was willing to talk to the agents. A subsequent investigation report that Winston submitted to his supervisor on October 3, 2004, confirmed this series of events.

The magistrate judge found "that the testimony of Claiborne and Winston is credible and unimpeached[,] . . . that the testimony of Black is not credible[, and] . . . that Claiborne and Winston did give Black his *Miranda* warnings before the interview in question and that [Black] agreed to talk with the agents after being warned of his rights." Mag. J. Op., 9/12/05, at 8. The district court reviewed the magistrate judge's report and recommendation *de novo* and found "that the officers gave [Black] his *Miranda* warnings before the interview on September 17, 2004; that [Black] agreed to talk with the agents after being advised of his rights; and that [Black's] statements were voluntarily given, based upon the totality of the surrounding circumstances." D. Ct. Op., 10/12/05, at 97-98. Because these factual findings are not clearly erroneous, we affirm the district court's denial of Black's motion to suppress his statements.

## III.

For the reasons above, we **AFFIRM** the district court's orders denying Black's motions to suppress.