NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0244n.06

No. 09-4419

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Mar 01, 2012*

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

    Plaintiff - Appellee

v.

MIGUEL WARE,

    Defendant - Appellant

)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: GIBBONS, STRANCH, and ROTH,[*] Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** A jury convicted Miguel Ware of drug and firearm offenses. He now appeals the denial of his motion to suppress a firearm and crack cocaine seized from his vehicle during a traffic stop, as well as inculpatory statements he made to law enforcement officers. We conclude that the district court's factual findings were not clearly erroneous, the Fourth Amendment was not violated, and any inculpatory statements Ware made were not "fruit of the poisonous tree." Accordingly, we **AFFIRM**.

## I. FACTS

On October 1, 2008, shortly before 5:00 p.m., Cleveland Det. Todd Staimpel received a telephone call from a known female informant, who reported that a younger black male known to her as "G" and driving a newer black Ford Focus was on his way to West 58th and Lawn Avenue.

---

[*]The Honorable Jane R. Roth, Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

The informant claimed that "G" possessed a large amount of crack cocaine and he always carried a gun. She provided no other information. Because the specified location was known for drug trafficking, prostitution, and gang activity, Det. Staimpel assumed that "G" was a drug dealer.

Det. Staimpel and his partner, Det. Robert Miles, responded quickly. Within ten minutes they drove from their detective bureau to West 58th and Lawn Avenue in their unmarked black Crown Victoria. Det. Miles requested backup assistance from uniformed police officers in the area. Because the detectives initially intended to locate and follow the Ford Focus, Det. Miles instructed any responding officers to report to West 65th and Lorain to plan an investigation.

Just before the detectives reached their destination, however, the informant called Det. Staimpel a second time to report that "G" was leaving her house. Within thirty seconds, the detectives spotted a late model black Ford Focus near West 58th and Lawn, just as the informant said they would. Two black males were riding in the car. Det. Staimpel made a u-turn and pulled in behind the Ford, which was waiting at a red light on the corner of West 58th and Lorain. The detectives watched as the Ford turned right onto Lorain without a turn signal.[1] A license plate check revealed that Ware and a female owned the car.

Having observed the traffic violation, the detectives followed the Ford westbound on Lorain until four or five marked patrol units arrived in the area. At that time, Det. Staimpel activated his car's lights and siren. The Ford immediately pulled over to the right side of the road at West 65th

---

[1]Under Ohio law, the failure to use a turn signal constitutes a traffic violation. Ohio Rev. Code Ann. § 4511.39 (West 2006).

and Lorain.[2]  Det. Staimpel parked the Crown Victoria directly behind the Ford.  An eastbound marked police unit stopped directly in front of the Ford, pinning it in.  Three or four other marked police vehicles stopped near the Ford, and all of the police officers got out of their vehicles.

As Det. Staimpel and Det. Miles approached the Ford from the rear, they observed both occupants moving around inside the car.  The driver looked down and reached with both hands to the center console on his right.  Det. Staimpel advised Det. Miles to watch the driver's hands; Det. Miles warned Det. Staimpel to "be careful."  The officers drew their weapons because the driver's reaching action heightened their concern for officer safety.  They ordered the car's occupants to put their hands into the air, and they complied.

Det. Staimpel then opened the driver's door to find that the driver, Ware, was not wearing a seat belt.  Det. Staimpel ordered Ware to get out of the car, turn, and immediately place his hands on the roof.  Ware complied with this demand, but he was still within reach of the car's interior.  Det. Staimpel spread Ware's legs and started patting him down for weapons.  On the other side of the car, Det. Miles took the same action with the passenger, Rayshun McKinley.  Approximately thirty seconds elapsed between the traffic stop and the removal of Ware and McKinley from the car.

As the detectives frisked Ware and McKinley for weapons, Officer McClain opened the car's center console and said, "There's a gun."  Sgt. Shoulders immediately looked into the center console and saw a Red Bull can.  Believing the can to be a fake canister for hiding drugs, Sgt. Shoulders pulled it apart and found several baggies containing crack cocaine.  Sgt. Shoulders emptied the

---

[2]There are not seven city blocks between West 58th and West 65th.  Det. Miles testified there are only three intersections on that stretch of Lorain:  West 58th, West 61st, and West 65th, where the traffic stop occurred.  Ware did not controvert this testimony.

contents of the Red Bull can onto the front passenger seat. Det. Staimpel told Officer McClain to leave the gun where he found it with the console open. Det. Staimpel could see the gun in the console as he finished frisking Ware and handcuffed him.

Det. Miles handcuffed McKinley and turned him over to a uniformed officer, who placed McKinley in the back seat of a marked patrol unit. Det. Miles then escorted Ware to the Crown Victoria and placed him in the back seat. Det. Miles verbally advised both Ware and McKinley of their *Miranda* rights, but he did not question them.

Det. Miles issued a traffic ticket to Ware for failing to use a turn signal and a citation for failing to wear a seat belt. The Ford was inventoried and impounded. ATF Agent Nathan Honaker and Det. Miles subsequently interviewed Ware at the detective bureau after again advising him of his *Miranda* rights. During questioning, Ware made inculpatory statements.

Det. Miles's police report about the traffic stop stated that the gun was found inside the Ford after Ware and McKinley were handcuffed and placed in separate cars. At the suppression hearing, however, the detectives insisted that the report was incorrect and that their testimony accurately portrayed the sequence of events.

Det. Staimpel informed the court that he had worked with the informant on two previous occasions, most recently two days before Ware was arrested, but the information she provided about gang activity in her neighborhood was not helpful to the police. Det. Staimpel knew the informant had access to inside information because her sons were gang members involved in drug activity, and the police valued any information she could provide. He also knew that Det. Miles had talked to the informant two years earlier and Det. Miles believed the informant was a reliable source. Det. Miles

disclosed that he had obtained information from the informant on three or four occasions that led to the recovery of several stolen cars and the identities of those who stole the cars.

The informant, Sheretta Allen, was called to testify at the suppression hearing. She explained that "G" was her daughter's boyfriend and the father of her grandchild. Because "G" and her daughter were having relationship problems, Allen wanted to get "G" away from her daughter. Allen called Det. Staimpel and asked him to do her the favor of stopping "G" because he carried a gun and drugs. She identified "G's" vehicle as a 2008 or 2009 black Ford Focus, and explained that he was expected to stop by her house at West 58th and Lawn to pay her for babysitting, but he would leave again shortly. Allen then called Det. Staimpel a second time to let him know when "G" left her house. She stated: "They went and did it for me. Then after they done it they said, boy, he must have made you awfully mad."

Allen also revealed that the two detectives had been to her house earlier that day looking for her youngest son. They accused him of being a gang member and shooting into a house. Allen was afraid her son would be arrested, so she lied to the detectives and told them that her son was not at home, even though he was. The detectives ultimately arrested her son later that evening. Allen first met the detectives several years earlier when her oldest son was stealing cars, but she denied that she worked as an informant for the Cleveland Police or that she provided the police with information about gang and drug activity or stolen cars.

Ware, who was 20 years old and admitted he used the nickname "G," provided a different version of events. On the day of the traffic stop, he left his mother-in-law's house at West 58th and Lawn. As he approached the intersection at West 58th and Lorain, he and McKinley noticed an

unmarked Crown Victoria as it made a u-turn and pulled in behind them. Ware claimed that he used his turn signal when he turned right onto Lorain. He denied that he pulled over at West 65th and Lorain, and instead claimed that he was "stormed" in the middle of the intersection by police cars appearing "from nowhere" and eight police officers who approached his car with their guns drawn. Ware also denied that he made any movements in the car or put his hands near the center console. He claimed his hands were up in the air before the police officers approached the car, and the police "snatched" him out of the car.

As Ware recalled the events, he stood at the driver's door between fifteen and thirty seconds for frisking and handcuffing. During that time, three police officers searched his car, but they did not find anything. He was then placed in a police car, but he was not told that he was under arrest, and he did not receive the *Miranda* warnings until he reached the police station. The gun and drugs were found in his car five minutes after he was seated in the police car. Ware watched as Sgt. Shoulders shook the drugs from a can onto the top of the car. Sgt. Shoulders then walked to the police car where Ware was seated, called Ware a liar, and asked Ware if he knew where there were "any more drugs or guns." Ware thought Sgt. Shoulders wanted him to "tell on somebody." Ware did not learn that Det. Miles had issued a traffic ticket and a citation to him until he received discovery in his criminal case.

McKinley confirmed that Ware was wearing a seat belt and used his turn signal when he turned right onto Lorain at the traffic light. Shortly after the turn, the police "stormed" them in the middle of the road with guns drawn, and the police did not give Ware a chance to pull over. McKinley denied that he or Ware made any movements inside the car. He recalled that the police

said, "There is a gun in the car," even before the police actually located the gun. McKinley denied

that the police said anything to them, like "put your hands up," but he contradicted himself and also

acknowledged that the police told them to raise their hands. As the police approached the car,

McKinley heard Ware say, "I got a license and insurance." A police officer answered, "We know

you got a license and insurance," but the officer did not ask to see the documents or any

identification. Instead, the police pulled Ware and McKinley from the car and put them in handcuffs.

None of the officers said anything about writing a ticket for failing to use a turn signal. McKinley

remained by the Ford only "a minute" before he was placed in a police car. He could not tell what

was happening to Ware, who was removed from the car on the opposite side. McKinley denied that

he and Ware received the *Miranda* rights.

McKinley reported that he spoke with Ware's lawyer approximately six months before the

suppression hearing while he was hospitalized for a gunshot wound. During that conversation,

McKinley remembered that Ware used his turn signal before the traffic stop. When the prosecutor

pressed for the date of McKinley's conversation with defense counsel, McKinley answered that he

had been shot six different times and he could not recall the date of the most recent shooting. Yet,

he was certain that Ware used a turn signal on October 1, 2008. McKinley also admitted that he

smoked marijuana, but he denied that the drug affected his memory.

Noting "[t]here are arguments that support or contradict the credibility of both camps here[,]"

the district court made an express finding that the detectives' testimony was more credible than

Ware's and McKinley's testimony. The court found that McKinley was not a credible witness

because he "almost never looked up when he was answering a question[,]" and he could not

remember the date of a recent hospitalization for a gunshot wound, yet he recalled in vivid detail that Ware used a turn signal on October 1, 2008. The court doubted McKinley actually paid such careful attention to Ware's driving.

The court discredited Ware's testimony because he was the only witness who insisted the gun was found five minutes after the traffic stop when he was already in the police car, while the detectives and McKinley all recalled that the gun was located very soon after the initial stop. Further, the court rejected as "not credible at all" Ware's testimony that three officers searched his car and did not find a weapon. The court did not believe the events happened as Ware said they did and "[o]ne officer would have found [the gun] in a matter of seconds, and I think that's what occurred." Because the court determined Ware was not credible on the "very important fact" of when the gun was located, the court found Ware also was not credible when he testified he used a turn signal.

## II. STANDARD OF REVIEW

In reviewing the denial of a motion to suppress, we examine the district court's factual findings for clear error and its conclusions of law *de novo*. *United States v. Buford*, 632 F.3d 264, 268 (6th Cir. 2011). We review the evidence in the light most likely to support the district court's decision, *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009), and we afford great deference to the district court's credibility determinations regarding witness testimony. *United States v. Hinojosa*, 606 F.3d 875, 882 (6th Cir. 2010). A factual finding is clearly erroneous when, although there is evidence to support the finding, we are left with the definite and firm conviction that a mistake has been committed. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). If there are two

permissible views of the evidence, the district court's determination between them cannot be clearly erroneous. *Id.*

### III. ANALYSIS

Ware has not carried his substantial burden to persuade us that the district court's credibility and factual findings were clearly erroneous in light of the evidence presented at the suppression hearing. *See Anderson*, 470 U.S. at 573; *Buford*, 632 F.3d at 268. Having heard the witnesses testify and having judged their demeanor, the district court acknowledged the existence of credibility issues throughout the testimony. The court sufficiently explained why it believed the detectives, and not Ware or McKinley, and the court's factual findings and legal conclusions logically followed from its credibility determinations. For the reasons we explain below, Ware has not shown that reversal is warranted.

#### A. Legality of the traffic stop

Ware first contends that the detectives stopped his car based on an unfounded and unreasonable suspicion that he might be involved in criminal activity as the result of an unreliable informant's tip, relying on *Florida v. J.L.*, 529 U.S. 266 (2000), and *Terry v. Ohio*, 392 U.S. 1 (1968). But the district court did not rest its analysis on whether the detectives had reasonable suspicion to conduct a *Terry* stop. In fact, the court pointedly noted the officers themselves well knew they did not have a sufficient basis to stop the car based only on Allen's tip.

Instead, the district court determined that the detectives had probable cause to stop the car when Ware committed a traffic violation by turning right without using a turn signal. Because probable cause existed for the traffic stop, the district court correctly held that the officers' subjective

or pretextual motivation for making the stop was not relevant under *Whren v. United States*, 517 U.S. 806, 812-13 (1996). *See also United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (observing, under *Whren*, that "an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle."); *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999) (affirming constitutionality of traffic stop under *Whren* where driver failed to use turn signal, despite strong case for disbelieving the officer's explanation for the stop). Ware has not explained why the district court's factual findings on this point are clearly erroneous or why we should set aside the legal conclusion that the stop was supported by probable cause and therefore constitutional under the Fourth Amendment.

**B. Legality of the search**

Ware next challenges his detention and the search of his car, claiming the conduct of the police exceeded the scope of an ordinary traffic stop. In light of the district court's supported factual findings, there is no merit in Ware's argument that the detectives lacked reasonable suspicion that he was engaged in criminal activity and that the detectives could only ask for his identification, driver's license, and proof of insurance, write him a traffic ticket, and allow him to proceed on his way. *See United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) ("after the deputies satisfied themselves that Erwin was not drunk or otherwise impaired, they were justified in continuing to detain Erwin if, by then, they had reasonable and articulable suspicion that Erwin was engaged in other criminal activity.") "To justify a patdown of the driver or a passenger during a traffic stop . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 784 (2009). In accordance

with *Johnson*, the district court found that the detectives reasonably suspected Ware was armed and dangerous based on Allen's reliable tip that Ware was carrying a gun, combined with Ware's furtive movements toward the center console as the officers approached the car.

Upon reaching the driver's door, Det. Staimpel was not required to ask Ware for identification, registration, and proof of insurance. "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam). As explained in *Mimms* and *Johnson*, the legitimate and weighty interest in police officer safety outweighs the *de minimis* additional intrusion of requiring a driver who is already lawfully stopped to get out of the car. *Mimms*, 434 U.S. at 110-11; *Johnson*, 129 S. Ct. at 786. The *Mimms* rule applies to passengers just as it does to drivers, *Maryland v. Wilson*, 519 U.S. 408, 415 (1997), so the detectives here were well within the bounds of the law when they directed Ware and McKinley to get out of the car. Once Ware was standing at the driver's door, Det. Staimpel had authority to frisk him for weapons based on the reasonable suspicion that Ware was armed and dangerous. *Johnson*, 129 S. Ct. at 786-87; *Mimms*, 434 U.S. at 112 (citing *Terry*, 392 U.S. at 21-22).

The remaining issue is whether the police violated the Fourth Amendment when they searched the center console of the Ford and located the firearm and crack cocaine. In *Arizona v. Gant*, — U.S. —, 129 S. Ct. 1710, 1714, 1718 (2009), the Supreme Court held that *New York v. Belton*, 453 U.S. 454 (1981), "does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." Ware argues

that he falls within the *Gant* rule because he was already handcuffed and sitting in the Crown

Victoria when the police officers searched his car. Thus, because he was already secured and did

not have access to his car's interior where he might access a weapon to use against the police, he

contends that the search of his car violated the Fourth Amendment.

Ware's view of the events, however, does not control our analysis. The district court

expressly found that, within seconds of the traffic stop, Ware was standing by the driver's door,

facing the car's interior and within reach of the passenger compartment with his hands unsecured

when Officer McClain quickly reached into the car and opened the center console, revealing the gun

and the Red Bull can. The district court also accepted Det. Staimpel's testimony that he could see

the gun from his position standing next to Ware at the door while he finished frisking Ware for

weapons, handcuffed him, placed him under arrest, and directed Det. Miles to take him to the Crown

Victoria.

The search for the firearm in the center console falls cleanly within *Michigan v. Long*, 463

U.S. 1032, 1049 (1983), which allows a police officer to search a vehicle passenger compartment

when the officer has a reasonable suspicion that an individual, whether or not the arrestee, is

dangerous and might access the vehicle to gain immediate control of a weapon. "[T]he concern for

officer safety extends not only to the suspect himself but to 'the area surrounding a suspect' where

he might 'gain immediate control of weapons.'" *United States v. Walker*, 615 F.3d 728, 732 (6th

Cir. 2010) (quoting *Long*, 463 U.S. at 1049). In *Gant*, the Supreme Court recognized the continuing

validity of *Michigan v. Long* as an established exception to the Fourth Amendment warrant

requirement. *Gant*, 129 S. Ct. at 1721. In a case very similar to this one, we relied on *Michigan v.*

*Long* to hold that a *Terry* frisk and a vehicle search based on a tip and the furtive movements of the car's occupants did not violate the Fourth Amendment. *See United States v. Graham*, 483 F.3d 431, 438-41 (6th Cir. 2007). *Gant* itself supports the search at issue here because police may search a vehicle incident to a recent occupant's arrest if "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* at 1719.

Finally, we conclude that Sgt. Shoulders did not violate the Fourth Amendment when he reached into the center console, picked up the Red Bull can, and pulled it apart to disclose a false compartment containing crack cocaine. By the time Sgt. Shoulders reached for the can, every other aspect of the known informant's tip had been corroborated by the police. Because the tip proved to be reliable, Sgt. Shoulders had probable cause to believe that the automobile would contain crack cocaine, just as the informant reported. *See Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam) (upholding automobile search for drugs based on a confidential informant's reliable and corroborated tip that "a rented red Toyota" with a particular license plate number would contain drugs); *United States v. Davis*, 430 F.3d 345, 364 (6th Cir. 2005) (and cases cited therein). Therefore, his search of the Red Bull can found in the center console did not violate the Fourth Amendment. *See United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006) ("an officer with probable cause to search a vehicle for drugs may inspect any item in that vehicle that could contain drugs, whether or not the item belonged to the driver, a passenger, or someone else claiming an expectation of privacy in its contents.") Because the search was constitutional, it logically follows that any inculpatory statements Ware may have made to law enforcement officers could not be excluded under the "fruit of the poisonous tree" doctrine. *See United States v. Williams*, 615 F.3d

657, 668 (6th Cir. 2010) (observing the doctrine precludes admissibility of evidence which police derivatively obtain from an *unconstitutional* search or seizure).

## IV. CONCLUSION

For all of the reasons stated, the traffic stop and the search of Ware's vehicle did not violate the Fourth Amendment. We **AFFIRM** the district court's denial of the motion to suppress.