*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee,*

    *v.*

DEMETRION GROSS,

          *Defendant-Appellant.*

No. 08-4051

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-00048-001—John R. Adams, District Judge.

Decided and Filed: October 19, 2010

Before: MARTIN and GIBBONS, Circuit Judges; MARBLEY, District Judge.[*]

_____

### COUNSEL

**ON BRIEF:** Nathan A. Ray, BURDON & MERLITTI, Akron, Ohio, for Appellant. Daniel R. Ranke, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

    MARBLEY, D. J., delivered the opinion of the court, in which MARTIN, J., joined. GIBBONS, J. (pp. 21–31), delivered a separate opinion concurring in part and dissenting in part.

_____

### OPINION

_____

    ALGENON L. MARBLEY, District Judge. Defendant-appellant Demetrion Gross appeals the criminal judgment and 180-month sentence issued by the district court upon his guilty plea to being a felon in possession of a firearm. Gross challenges the

_____

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

district court's denial of a motion to suppress evidence based on an alleged unlawful seizure. He also disputes the determination that he was an armed career criminal under 18 U.S.C. § 924(e), arguing that a prior conviction for escape was not necessarily a "violent felony" under the Armed Career Criminal Act ("ACCA").

For the following reasons, we affirm the district court's denial of Gross's motion to suppress as to the DNA swab and confession, reverse the district court's denial of Gross's motion to suppress as to the firearm, vacate the sentence imposed, and remand to the district court for further proceedings.

I.

In the early morning hours of November 15, 2007, Cuyahoga Metropolitan Housing Authority Police Officer Eric Williams was on general patrol of high-crime areas of high- and low-rise public housing. While passing through the parking lot of one of the housing complexes, Williams encountered a legally parked Oldsmobile automobile with the engine running but no apparent driver. Williams, however, noticed a barely-visible passenger who was slumped down in the front-passenger seat of the vehicle. He checked the vehicle's license plates against an electronic database and discovered that there were no outstanding warrants or issues related to the owner of the car. Williams then parked his police vehicle directly behind the Oldsmobile and turned on his vehicle spotlights. He observed the passenger react to the spotlights by sitting up abruptly and then slumping down further in his seat. Williams then exited his police vehicle and approached the passenger side of the Oldsmobile by foot.

Williams encountered Gross sitting in the passenger seat and introduced himself by speaking through the closed passenger window. Gross then cracked the door to speak to Williams. Williams asked what he was doing in the area, and Gross replied that he was "over [at] his girlfriend's house." During the course of the conversation, Williams noticed a partially consumed bottle of Remy Martin cognac located on the passenger side of the center console. When Williams asked for identification, Gross said that he did not have any identification on him but he could get it if he could go into the house. Williams advised that it would not be necessary to do so if Gross would provide his name, date of

birth, and social security number. After Williams asked for them several times, Gross verbally gave Williams his identifying details.

Williams ran a warrant check, which revealed that Gross had an outstanding felony warrant for carrying a concealed weapon. He then advised Gross that he was under arrest, asked him to step from the vehicle, and proceeded to take Gross into custody by handcuffing him. Williams briefly patted down Gross but did not conduct a search incident to arrest at the scene. Williams then transported Gross to the sheriff's department.

When Williams and Gross arrived at the sally port of the sheriff's department, Gross was searched again and passed through a metal detector. The metal detector went off, but, despite repeated attempts to locate the metal object triggering the detector and repeated passes through the machine, the officers were unable to locate the source of the problem. Gross was then escorted into the police bullpen, where he immediately asked to use the restroom. Gross entered a restroom pod that obscured Williams's view of Gross from the shoulder down.

A short time later, officers discovered a .380 caliber firearm near the toilet that Gross had used. An investigation into how the firearm entered the jail revealed that Gross was the only inmate from the street to have access that day to the pod where the gun was located. On November 19, 2007, four days after Gross's arrest, and while Gross was still detained, officers advised Gross of their investigation of the firearm and informed him of his *Miranda* rights. Gross then waived his *Miranda* rights, said that he knew who brought the weapon into the jail, but denied that it was his. The officers requested that Gross consent to a DNA test, but Gross refused. The following day, a search warrant was obtained to take an oral swab for the collection of DNA evidence. After taking the swab, DNA analysis revealed that genetic material taken from the firearm and its ammunition matched Gross's DNA.

On January 17, 2008, approximately two months after his arrest and while still detained, Gross, of his own accord, contacted Bureau of Alcohol, Tobacco, and Firearms Agent ("ATF") Kimani Howell, to whom he had been previously introduced, and

requested a meeting. On January 18, 2008, Agent Howell met with Gross and again advised him of his *Miranda* rights. Gross again waived his *Miranda* rights and gave a statement admitting to bringing the firearm into the police bullpen.

Gross was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Gross initially entered a plea of not guilty. He then filed a motion to suppress "all evidence obtained after the initial stop of the Defendant . . . that the government intends to introduce at trial." Gross's suppression motion was denied by the district court.

Gross thereafter pled guilty pursuant to a written plea agreement with the government. In the plea agreement, Gross reserved the right to appeal the district court's denial of his motion to suppress. The plea agreement also noted that one of the bases for his eligibility for a 15-year minimum sentence under the Armed Career Criminal Act might be impacted by a legal question then pending before the Supreme Court. That question dealt with whether an escape conviction based on a failure to report qualified as a violent felony under the Act. *See Chambers v. United States*, 129 S. Ct. 687 (2009). The plea agreement therefore provided:

> If the presentence report determines that the defendant's escape convictions, which are referenced in the Indictment, rest solely on his failure to report to a penal institution or halfway house and the Supreme Court determines that an escape conviction based solely on the failure to report does not qualify as a violent felony, then the defendant understands that he will not be an Armed Career Criminal, as that term is defined in 924(e)(1). In that case, the defendant agrees that his base offense level will be 24 pursuant to [United States Sentencing Guidelines ("U.S.S.G.")] Section 2K2.1.

The district court concluded that Gross was an armed career criminal under 18 U.S.C. § 924(e) and, pursuant to U.S.S.G. § 4B1.4, sentenced Gross to 180 months imprisonment concurrent with a state sentence then being served. Gross timely filed a notice of appeal.

II.

"'When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*.'" *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008) (citing *United States v. Simpson*, 520 F.3d 531, 534 (6th Cir. 2008)).  We further review *de novo* "the district court's determination as to whether certain facts establish a seizure or detention in violation of the Fourth Amendment." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000); *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.").  "When a district court has denied the motion to suppress, we must 'consider the evidence in the light most favorable to the government.'" *United States v. Pearce*, 531 F.3d 374, 379 (6th Cir. 2008) (quoting *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (*en banc*)).

A.

"This Court has explained that there are three types of permissible encounters between the police and citizens: '(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.'" *Waldon*, 206 F.3d at 602 (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)).

Although "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures" by approaching individuals in public places and asking questions, *United States v. Drayton*, 536 U.S. 194, 200 (2002), a consensual encounter becomes a seizure when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  *See also Florida v. Bostick*, 501 U.S. 429, 434–35 (1991) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage—as long as

the police do not convey a message that compliance with their request is required." (citations omitted)); *United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999) ("Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the [officer's] request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment."). Factors that, if present, indicate that a seizure occurred include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

To justify a brief, investigative stop under *Terry v. Ohio*, an officer must point to specific, articulable facts that gave rise to a "reasonable suspicion" that the suspect was engaged in criminal activity. 392 U.S. 1, 21 (1968). "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir. 2004) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations and internal quotation marks omitted).

Gross argues that it was improper for Williams to approach the parked vehicle in which Gross was sitting without some reasonable suspicion. According to Gross, Williams's act of parking his marked police car directly behind the Oldsmobile, thereby blocking the car in the parking space, would cause a reasonable person not to feel free to leave the area and therefore constituted a *Terry* stop. He also contends that, at the time Williams parked his police car behind the vehicle in which he was sitting, Williams had already observed that the vehicle was legally parked and, based upon the check of an electronic database, knew that there were no outstanding warrants or issues related to the owner of the car. Gross asserts, therefore, that there was no reasonable suspicion to approach the vehicle.

Gross is correct that when Officer Williams blocked the car in, he began an investigatory *Terry* stop. We recently held that a similar act by this same Officer Williams was a warrantless *Terry* seizure requiring reasonable suspicion. *See United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). In *See*, Officer Williams was on patrol in a public-housing parking lot when he noticed a car that was backed into a parking space in a dimly lit area farther from the building than other vacant spots. *Id.* at 311. Williams then pulled his patrol car in front of See's car and parked so that See could not move his vehicle. *Id.* at 312. We held that "the blocking of See's car to determine the identity of the occupants and maintain the status quo while obtaining this information was a warrantless *Terry* seizure . . . [because] a reasonable person in See's position would not have felt free to leave." *Id.* at 313 (citations and internal quotation marks omitted). Because Williams's actions here were markedly similar to his actions in *See*, he initiated a *Terry* stop requiring reasonable suspicion.[1]

It is readily apparent that, under the circumstances, Williams did not have a particularized and objective basis for suspecting Gross of criminal activity at the time of the stop. Indeed, Williams admitted at the suppression hearing that "at the time [he] exited the car, it [was] safe to say that [he was not] aware that there was any crime being committed." The government does not argue that Williams had a reasonable suspicion to block or to approach the car. Rather, the government asserts that, in light of the fact that Williams observed a vehicle parked in a public parking lot with the engine running and no driver behind the wheel in the early hours of the morning with a passenger "slumped down " in the front passenger seat, Williams's "community-caretaking" function required him to investigate the facts further. *See United States v. Koger*, 152 F. App'x 429, 430–31 (6th Cir. 2005); *United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) ("As the Supreme Court has explained, the community caretaking function of the police applies only to actions that are 'totally divorced from the detection,

---

[1]That Gross was a passenger in the car rather than the driver is of no moment, as a passenger in a seized vehicle is also made to feel that he is not free to leave. *See Brendlin v. California*, 551 U.S. 249, 255 (2007) (holding that automobile passengers are seized during traffic stops even though the police command to stop is directed to the driver because a reasonable person in the passenger seat would not feel free to leave once the police have stopped the vehicle); *United States v. Jones*, 562 F.3d 768, 772–73 (6th Cir. 2009); *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008).

investigation, or acquisition of evidence relating to the violation of a criminal statute.'" (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973))); *Taylor v. Mich. Dep't of Natural Res.*, 502 F.3d 452, 462 (6th Cir. 2007) ("Case law indicates that the community caretaking function articulated in *Cady* has been principally applied to warrantless searches of automobiles.").

The government relies on *United States v. Koger* for the proposition that a community-caretaking purpose justified a *Terry* stop in this case. This reliance, however, is misplaced. In *Koger*, the arresting officer approached a running vehicle that was illegally stopped and partially blocking a local highway. *Koger*, 152 F. App'x at 430. The officers observed Koger asleep or unconscious in the driver's seat and knocked on the driver's window. When Koger rolled down his window, the officers noticed the strong odor of marijuana, asked Koger for his license, and a computer check revealed that his license was suspended. A subsequent consensual search of the vehicle uncovered drugs and a firearm. We upheld the district court's denial of Koger's suppression motion, and, in doing so, we mentioned the magistrate judge's alternative rationale for denial based on the officer's "community caretaker" function. *Id*. It is important to note, however, that the magistrate judge concluded that the "initial approach to the car was lawful . . . [because] the deputies had probable cause to approach the vehicle and investigate the situation in that the vehicle [illegally] obstructed traffic." *Id*. The readily apparent illegality that was present in *Koger*, therefore, distinguishes that case from the non-threatening and lawful circumstance presented here of a passenger seated in a parked car waiting outside a housing complex. Furthermore, any purported community-caretaking function in this instance could have been accomplished through a consensual encounter rather than an investigative stop. *See See*, 574 F.3d at 315 (Gilman, J., concurring) ("Officer Williams had every right to investigate further, but he should have simply parked his patrol car alongside See's vehicle to carry out the investigation in a consensual manner. Instead, he parked his patrol car in such a way so as to block in See's vehicle, thus transforming the encounter into a *Terry* stop.").

Accordingly, because Officer Williams was unable to articulate a reasonable suspicion for the investigative stop, it constituted an unlawful seizure of Gross.

B.

The illegality of the stop, however, does not end the suppression analysis. We must consider whether the evidence to have been introduced against Gross, including the firearm, the DNA test, and Gross's confession, must be suppressed under the exclusionary rule.

The animating purpose underlying the exclusionary rule is the deterrence of unlawful government behavior. *Elkins v. United States*, 364 U.S. 206, 217 (1960) (exclusionary rule's "purpose is to deter – to compel respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it."). The Supreme Court has "declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Ceccolini*, 435 U.S. 268, 276 (1978) (citing to *Brown*, 422 U.S. at 603). Rather, "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990). Where, as here, the three pieces of evidence were obtained after Gross was arrested and detained pursuant to an outstanding arrest warrant, the relevant question is whether each piece of evidence was obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *see also United States v. Hudson*, 405 F.3d 425, 440 (6th Cir. 2005) (quoting *Wong Sun*); *United States v. Castillo*, 238 F.3d 424 (Table), 2000 WL 1800481, at *5–6 (6th Cir. Nov. 28, 2000) (concluding that a suspect's fleeing an unlawful detention dissipated the taint that might have resulted from his detention, rendering admissible the drug evidence found incident to his arrest for flight). Accordingly, we must consider whether "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon the evidence by the original illegality." *United States v. Crews*, 445 U.S. 463, 471

(1980).  In doing so, we consider all relevant factors "such as the length of time between the illegal seizure and the [discovery of evidence or the confession], the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his *Miranda* rights before he [confessed]." *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003) (citing *Kaupp v. Texas*, 538 U.S. 626, 632–33 (2003), and *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).  No single factor in this analysis, however, is dispositive of attenuation.  *Brown*, 422 U.S. 603.

In view of the time that elapsed between the unlawful seizure of Gross in the parked car and Gross's subsequent voluntary confession, the first factor weighs significantly toward attenuation.[2] Gross's voluntary confession occurred approximately two months later, on January 18, 2008.  Having already been advised of his *Miranda* rights and having signed a written waiver of those rights, Gross notified ATF agents that he wished to speak with them regarding how the firearm made its way into the jail. Agent Howell advised Gross a second time of his *Miranda* rights, Gross signed another written waiver of those rights, and only then did Gross admit to bringing the firearm into the jail. The significant length of time between the unlawful seizure of Gross and his voluntary confession while in lawful police custody on an outstanding arrest warrant counsels a finding of attenuation in this case as to the confession.  *See United States v. Akridge*, 346 F.3d 618, 628 (6th Cir. 2003) (finding "most dispositive," in a suppression analysis, "the degree of free will exercised" by defendants in giving incriminating statements following an illegal search of their home and "the temporal attenuation" created by a one-month gap between the search and questioning); *Brown*, 422 U.S. at

---

[2]While time also elapsed between the unlawful stop and the DNA swab – which was taken from Gross on November 20, 2007, five days after Gross was arrested and only upon police obtaining a warrant for the search – this factor is most appropriate in determining whether a confession has been purged of taint.  *See Wong Sun*, 371 U.S. at 491 (fact that Wong Sun was released and voluntarily returned several days later to make statement dissipated the taint); *Brown*, 422 U.S. at 603 (noting that one factor to consider for attenuation is the "temporal proximity of the arrest and the confession"); *United States v. Williams*, – F.3d –, 2010 WL 306136, at *8 (6th Cir. Aug. 6, 2010); *United States v. Jackson*, 172 F.3d 874, 874 (6th Cir. 1998) (discussing time as a factor in determining whether a confession is purged of taint); *see also United States v. Najjar*, 300 F.3d 466, 478 (4th Cir. 2002) (noting that in *Brown*, the Supreme Court emphasized that the temporal factors aid in a determination of whether the confession was an act of free will, and that "the mere passage of time cannot serve to make tainted physical evidence admissible.").

602 (requiring that a statement made following an illegal arrest be both voluntary and "sufficiently an act of free will to purge the primary taint" to be admissible); *Harris*, 495 U.S. at 20 ("We do hold that the station house statement in this case was admissible because Harris was in legal custody . . . and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else."). The district court did not err in denying Gross's motion to suppress the confession as it was sufficiently attenuated from the initial illegal seizure because of its voluntary nature made clear by the amount of time that passed and Gross's initiation of the meeting with ATF agents.

As to the second factor – the presence of intervening circumstances – there were intervening circumstances that served to sever the chain linking the unlawful detention and the DNA swab, further dissipating any taint. The DNA swab was only taken after a valid search warrant was taken in order to swab Gross. The remaining piece of evidence is the firearm. Central to the determination of whether the firearm was purged of the taint of the illegal stop is whether the discovery of the warrant constituted an intervening circumstance. We hold that it did not.

We have not previously considered whether the discovery of a valid arrest warrant may serve to dissipate the taint of an unlawful detention. *United States v. Williams*, 615 F.3d 657, 670 (6th Cir. 2010) ("[W]e have never adopted its [the Seventh Circuit's treatment of a warrant as an intervening circumstance] approach as the law of this circuit.").**[3]** The case closest to the issue in our Circuit is *United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005), in which we considered the issue of whether suppression was appropriate where police officers stopped a car without reasonable suspicion because they were in search of an individual with an outstanding arrest warrant and

---

**[3]**We have held that if a suspect's response to an illegal stop is a new and distinct crime, such as flight, any evidence recovered incident to the arrest for that crime is not tainted by the unlawfulness of the initial detention. *Castillo*, 2000 WL 1800481, at \*5–6 (high-speed flight from officers constituted an intervening act of purge taint of unlawful detention); *United States v. Jefferson*, 182 F.3d 919 (Table), 1999 WL 519298, at \* 4 (6th Cir. July 15, 1999) (defendant's flight from scene and use of force against officers constituted intervening circumstance that purged taint). Unlike in *Castillo* and *Jefferson*, however, Gross did not engage in any unlawful behavior after Williams illegally seized him. Gross did not respond to Williams's illegal stop with a new and distinct crime, such as flight or violence, that would serve to purge the taint of the unlawful detention.

believed him to be a passenger in the car. In *Hudson*, police officers stopped a car in order to look for Hudson, whom they knew to have an outstanding arrest warrant, even though the officers did not have reasonable suspicion to believe that Hudson would be in the car. 405 F.3d at 429-33. After stopping the car, the police removed all three occupants from the car, patted them down, and placed them in handcuffs. *Id.* at 429. Only after patting down the occupants of the car and handcuffing them did the police identify Hudson as one of the passengers. *Id.* During the patdown of Hudson, one of the officers felt an object in Hudson's pocket, determined that it was cocaine in plastic baggies, and confirmed with Hudson that he had crack cocaine. *Id.* After we determined that the stop of the car was illegal, we suppressed the drugs found on Hudson because "when the police make an illegal stop for the very purpose of arresting the person stopped, they are thereby exploiting the illegal stop in a manner prohibited by the Fourth Amendment and the evidence obtained in a pat-down of the arrested suspect or in a search incident to the arrest must be suppressed." *Id.* at 440.

In our analysis, we considered two cases from the Seventh Circuit, *United States v. Green*, 111 F.3d 515, 520-23 (7th Cir. 1997), and *United States v. Johnson*, 383 F.3d 538, 546 (7th Cir. 2004). Although both *Green* and *Johnson* are cases in which the Seventh Circuit held that the discovery of a warrant during an illegal stop constituted an intervening circumstance,[4] in *Hudson*, we relied on *Green* only to emphasize that the purpose of an illegal stop or search is determinative of whether the fruits of the search will be suppressed. *Hudson*, 405 F.3d at 440; *Williams*, 615 F.3d at 670 (noting that *Hudson* relied on the Seventh Circuit cases "for the separate proposition that evidence obtained pursuant to an illegal seizure must be suppressed when the police target the defendant."). *Hudson* derives its holding that purpose matters from *Green*'s discussion

---

[4]In *Green*, the officers illegally stopped the occupants of a car, for whom they had no reasonable suspicion, in order to gather information about a unrelated third party. In the course of that stop, the officers discovered an outstanding warrant for one of the men. *Green*, 111 F.3d at 517. The Seventh Circuit held that the discovery of the warrant constituted an intervening circumstance. In *Johnson*, an officer effectuated an illegal *Terry* stop on the defendant, but upon reaching the car the defendant was driving, recognized him as someone the officer knew to have an outstanding warrant. *Johnson*, 383 F.3d at 545. The court cited to *Green* to support its finding of an intervening circumstance, and went on to hold that after the officer's identification of the defendant, the officer had probable cause to arrest him. *Id.* at 544-45.

of the attenuation doctrine factor as to "the purpose and flagrancy of the official misconduct." *Hudson*, 405 F.3d at 440; *Green*, 111 F.3d at 523. Under *Hudson*, therefore, where the purpose of an illegal stop is to arrest a suspect with an outstanding warrant, the evidentiary fruits of that stop must be suppressed; and, just as it was prior to *Hudson* in previous cases applying the attenuation doctrine, purpose is a factor in determining whether evidence should be purged of its primary taint. *Lopez-Arias*, 344 F.3d at 630.

Despite *Hudson*'s reliance on *Green* solely for the purpose prong, and our recent and express pronouncement in *Williams* that we have not adopted the Seventh Circuit cases, the dissent argues that *Hudson* stands for the proposition that, so long as the purpose of a stop was not to arrest a suspect with an outstanding warrant, the incidental discovery of a warrant during the course of the illegal stop is an intervening circumstance.[5] Although the dissent is in accord with the Seventh Circuit, other circuits have applied the exclusionary rule despite the discovery of an outstanding arrest warrant during the course of an illegal search. In *United States v. Lopez*, 443 F.3d 1280 (10th Cir. 2006), the Tenth Circuit held that, where there was no reasonable suspicion or probable cause to detain a defendant who was standing next to a legally parked car that had not been reported stolen, the detention of the defendant while an officer ran a warrants check constituted an unlawful seizure that violated the defendant's Fourth Amendment rights. *Id.* at 1286. Notwithstanding the officer's discovery of an outstanding warrant during the check, the Tenth Circuit suppressed the drugs that were found pursuant to the defendant's arrest because of the unlawful detention. *Id.* Similarly, in *United States v. Luckett*, 484 F.2d 89, 90-91 (9th Cir. 1973), the Ninth Circuit held that, where a jaywalker had produced sufficient identification and the officer had already executed a traffic citation, "[b]ecause they [the officers] had no reasonable grounds to be suspicious that there might be a warrant outstanding against [the

---

[5]The use of "incidental" lends itself to an interpretation that Officer Williams discovered the outstanding warrant by happenstance. In fact, the discovery of the warrant was only because of active steps that Officer Williams took. Gross's arrest was not based on any action initiated by Gross himself, but rather it required the affirmative act by Officer Williams of illegally seizing Gross and running the warrant check.

defendant], this continued detention was unreasonable, and its fruits, therefore, were properly suppressed by the district court." We agree with the outcomes of these cases and hold that, where there is a stop with no legal purpose, the discovery of a warrant during that stop will not constitute an intervening circumstance.

To hold otherwise would result in a rule that creates a new form of police investigation, whereby an officer patrolling a high crime area may, without consequence, illegally stop a group of residents where he has a "police hunch" that the residents may: 1) have outstanding warrants; or 2) be engaged in some activity that does not rise to a level of reasonable suspicion. Despite a lack of reasonable suspicion, a well-established constitutional requirement, the officer may then seize those individuals, ask for their identifying information (which the individuals will feel coerced into giving as they will have been seized and will not feel free to leave or end the encounter), run their names through a warrant database, and then proceed to arrest and search those individuals for whom a warrant appears. Under this scenario, an officer need no longer have reasonable suspicion on probable cause, the very crux of our Fourth Amendment jurisprudence. *Terry v. Ohio*, 392 U.S. 1 (1968); *Williams*, 615 F.3d at 670, n.6 ("[A]llowing information obtained from a suspect about an outstanding warrant to purge the taint of an unconstitutional search or seizure would have deleterious effects. It would encourage officers to seize individuals without reasonable suspicion-not merely engage them in consensual encounters-and ask them about outstanding warrants.")[6]; *see also* Michael Kimberly, *Discovering Arrest Warrants: Intervening Police Conduct and Foreseeability*, 118 YALE L.J. 177 (2008) (commenting that a rule where the discovery of an outstanding warrant constitutes an intervening circumstance has the perverse effect of encouraging law enforcement officials to engage in illegal stops where they have an inarticulatable hunch regarding a person on the street or in a car).

---

[6]Although *Williams* differs from this case because Williams himself provided the information about the outstanding warrant (rather than having his name checked in a warrant database), the facts are similar in that Gross did not feel free to end the encounter or refuse to provide his information. *Williams*, 615 F.3d at 662. In fact, the illegal encounter was prolonged because Gross was illegally seized during the time that Officer Williams took to run the warrant check. *See Luckett*, 484 F.2d at 90-91 (continued detention while police officer ran warrant check was impermissible).

Furthermore, holding that the discovery of a warrant after an illegal stop is an intervening circumstance so long as the purpose of the stop is not because the officer believes the suspect has an outstanding warrant would encourage an officer to offer alternative reasons for the stop, such as a police hunch or community-caretaking.[7] Essentially, we will have created a system of post-hoc rationalization through which the Fourth Amendment's prohibition against illegal searches and seizures can be nullified.

For these reasons, where an officer engages in an illegal stop and then discovers through his own investigation or prompting that the individual or individuals he has illegally stopped have outstanding warrants, the evidentiary fruits of the subsequent arrest are tainted as fruit of the poisonous tree and must be suppressed. That evidence may only be admitted where there is sufficient attenuation, separate and apart from the discovery of the warrant, to dissipate the taint. Accordingly, there was no intervening circumstance that purges the taint of the illegal stop, without which Gross's arrest and detention in the jail bullpen would not have occurred, from the discovery of the firearm behind the toilet.

Finally, we consider the purpose and flagrancy of the official misconduct. As to flagrancy, while it is disheartening that Williams had once before blocked in a car in a similar manner, it was not until our recent decision in *See*, decided after the events in this case, that it would have been clear to Williams that his methods were decidedly an investigatory stop and not a consensual encounter. As to purpose, Williams did not have a lawful purpose for his stop, nor was he, as the officers were in *Green*, seeking evidence against a third-party. He also did not, as in *Williams*, "immediately [ask] several questions related to criminal activity other than trespassing." *Williams*, 615 F.3d at 670–71. While Williams's actions could be interpreted to have been "in the hope that

---

[7]Where an officer has a lawful purpose for a stop, such as community-caretaking, reasonable suspicion, probable cause, or a valid warrant, the stop itself would be legal, and any evidence discovered pursuant to the discovery of an outstanding warrant and subsequent arrest would be admissible. But, that was not the case *sub judice*. We have already determined that the stop was unlawful, and that Officer Williams could have conducted his investigation through a consensual encounter rather than an investigative stop. Officer Williams instead effectuated an unlawful stop. The exclusionary rule is appropriate in this case because it was designed for this very purpose, to deter law enforcement officials from violating the Fourth Amendment by conducting illegal stops and searches. *Brown*, 422 U.S. at 602; *Pearce*, 531 F.3d at 381.

something might turn up," *United States v. Shaw*, 464 F.3d 615, 630 (6th Cir. 2006), unlike in *Shaw* or *Brown*, there is not sufficient evidence in the record to show that Officer Williams " knew [he] did not have probable cause." *Id.* at 631.  Accordingly, the purpose and flagrancy of Williams's actions do not weigh heavily in the attenuation determination.

In weighing the three factors—time, intervening circumstances, and purpose/flagrancy—we cannot conclude that the DNA swab and confession against Gross retain any taint from the initial unlawful seizure.  The DNA evidence was obtained several days after arrest and only upon the issuance of a search warrant, and Gross's confession occurred only after he voluntarily sought to give an incriminating statement to agents two months after arrest and after a second waiver of his *Miranda* rights.  The firearm, however, was found only a short time after Gross entered the jail bullpen, and was not separated from the taint by any intervening circumstances.

Based on the foregoing analysis, we conclude the DNA swab and confession evidence obtained against Gross is sufficiently attenuated from the prior unlawful seizure such that any taint has dissipated, but that the possession of the firearm was not sufficiently attenuated and must be suppressed as fruit of the poisonous tree. We therefore affirm the district court's denial of Gross's suppression motion as to the DNA swab and confession, but reverse as to the firearm, and remand for further proceedings.

### III.

This Court reviews *de novo* the district court's legal conclusion that a crime constitutes a "violent felony" under the ACCA.  *United States v. Hargrove*, 416 F.3d 486, 494 (6th Cir. 2005) (citing *United States v. Martin*, 378 F.3d 578, 580 (6th Cir. 2004), and *United States v. Cooper*, 302 F.3d 592, 594 (6th Cir. 2002)).

Both Gross and the government urge the Court to remand the case to the district court for consideration of whether Gross's prior escape conviction is a crime of violence under the ACCA.  At sentencing, the district court concluded that Gross was an armed career criminal under 18 U.S.C. § 924(e) based on three prior felony convictions in the

Ohio state courts: (1) felonious assault with firearm specification; (2) attempted felonious assault; and (3) escape. In Gross's plea agreement and at Gross's plea hearing, however, the parties anticipated that the district court's ACCA analysis with respect to the escape conviction might be implicated by *Chambers v. United States*, 129 S. Ct. 687 (2009), which was then pending before the Supreme Court. The parties and the district court therefore agreed that Gross had raised and preserved the issue for appeal in the event that *Chambers* impacted his eligibility under the ACCA. The district court then sentenced Gross to the statutory minimum 180 months under the ACCA.

The Supreme Court subsequently decided *Chambers* on January 13, 2009. The Court held that at least one type of escape conviction under Illinois law—"failure to report for penal confinement"—is not a "violent felony" under the ACCA. 129 S. Ct. at 689. Shortly thereafter, this Court decided in *United States v. Ford* that *Chambers* abrogated the Circuit's prior view that "all escape offenses—from a failure to report at one end of the spectrum to a breakout at the other—constitute crimes of violence." 560 F.3d 420, 423 (6th Cir. 2009) (citing cases).[8]

In order to determine whether Gross was convicted of a violent felony under *Chambers* and *Ford*, we must now examine the nature of the Ohio escape statute under which Gross was convicted. The Presentence Investigation Report ("PSR") indicates only that Gross was convicted of a third-degree escape penalty under Ohio Rev. Code Ann. § 2921.34.[9] That statute provides:

> No person, knowing the person is under detention or being reckless in that regard, shall purposely break or attempt to break the detention, or purposely fail to return to detention, either following temporary leave granted for a specific purpose or limited period, or at the time required when serving a sentence in intermittent confinement.

Ohio Rev. Code Ann. § 2921.34(A)(1).

---

[8]In this context, the court treats a "crime of violence" under U.S.S.G. § 4B1.1(a) the same as a "violent felony" under the ACCA. *See Ford*, 560 F.3d at 421.

[9]The PSR does not provide a factual description of the prior escape conviction. In any event, a factual description of a prior conviction contained in a PSR may not be used to determine whether that conviction is a crime of violence. *United States v. Wynn*, 579 F.3d 567, 575–76 (6th Cir. 2009).

"[I]n determining the nature of a defendant's prior conviction, we apply a 'categorical' approach, meaning that we look at the statutory definition of the crime of conviction, not the facts underlying that conviction, to determine the nature of the crime." *Ford*, 560 F.3d at 421–22 (quoting *Taylor v. United States*, 495 U.S. 575, 602 (1990)). The relevant first inquiry under *Chambers* and *Ford*, then, is to determine and distinguish the ways in which the statute characterizes an escape conviction. *See Chambers*, 129 S. Ct. at 691; *Ford*, 560 F.3d at 423–24 (concluding that the Kentucky escape statutes, Ky. Rev. Stat. Ann. §§520.010–.040, characterize an escape conviction in four ways: (1) leaving custody with the use or threat of force; (2) leaving custody in a secured setting; (3) leaving custody in a non-secured setting by "walking away"; and (4) failure to report).

At first glance, it appears that the Ohio statute divides the escape conviction into two distinct categories. First, the statute proscribes a purposeful break or attempt to break from a detention[10] that the defendant knew or should have known had already commenced. Ohio Rev. Code Ann. § 2921.34(A)(1). Second, the statute proscribes a purposeful failure to return to detention, either following temporary leave or when serving a sentence of intermittent confinement. Ohio Rev. Code Ann. § 2921.34(A)(1). It is not entirely clear that these two distinct categories demarcate the categorical line between violent and non-violent felonies. Although the second category includes

---

[10]"Detention" is broadly defined as:

> arrest; confinement in any vehicle subsequent to an arrest; confinement in any public or private facility for custody of persons charged with or convicted of crime in this state or another state or under the laws of the United States or alleged or found to be a delinquent child or unruly child in this state or another state or under the laws of the United States; hospitalization, institutionalization, or confinement in any public or private facility that is ordered pursuant to [state law]; confinement in any vehicle for transportation to or from any facility of any of those natures; detention for extradition or deportation; except as provided in this division, supervision by any employee of any facility of any of those natures that is incidental to hospitalization, institutionalization, or confinement in the facility but that occurs outside the facility; supervision by an employee of the department of rehabilitation and correction of a person on any type of release from a state correctional institution; or confinement in any vehicle, airplane, or place while being returned from outside of this state into this state by a private person or entity pursuant to [state law]. For a person confined in a county jail who participates in a county jail industry program . . . "detention" includes time spent at an assigned work site and going to and from the work site.

Ohio Rev. Code Ann. § 2921.01(E).

precisely the type of "failure to report" violation that the Supreme Court found to be non-violent in *Chambers*, the first category appears to include all other manners of escape, including escape from arrest, escape from custodial confinement in a variety of circumstances, and escape from a jail-program work detail. This category might include, for example, the type of walkaway escape found not to be a crime of violence in *Ford*. 560 F.3d at 424–26; *see also United States v. Mansur*, 375 F. App'x 458, 464 n.8 (6th Cir. 2010). The categorization analysis, therefore, may not be such a straightforward endeavor.

In any event, there is a missing fact that is crucial to guide and limit our analysis: we do not know for what type of escape Gross was convicted. Where "it is possible to violate a criminal law in a way that amounts to a crime of violence and a way that does not, we may look at the indictment, guilty plea and similar documents to see if they 'necessarily' establish the nature of the prior offense." *Ford*, 560 F.3d at 422 (citing *Shepard v. United States*, 544 U.S. 13, 26 (2005)). Because the record before us does not contain these documents, we remand to the district court. On remand, the district court should attempt to clarify the nature of the prior escape conviction so that it may be analyzed under the principles discussed in *Chambers*, *Ford*, *Taylor*, and *Shepard*. The "district court should consider 'the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or . . . some comparable judicial record of this information.'" *United States v. Anglin*, 601 F.3d 523, 530 (6th Cir. 2010) (quoting *Shepard*, 544 U.S. at 26 (alteration in original)). Because "[t]he government bears the burden of proving that [Gross's] escape conviction was a crime of violence[,] . . . [i]f the government does not meet its burden, the district court may not use [the] escape conviction to resentence him as a career offender." *Id.* at 531 (citing *United States v. Baker*, 559 F.3d 443, 455 n.10 (6th Cir. 2009)).

IV.

For the foregoing reasons, we affirm in part and reverse in part the district court's denial of the motion to suppress, vacate Gross's sentence, and remand to the district court for further proceedings.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that a remand is necessary to determine whether Gross's prior escape conviction is a crime of violence under the Armed Career Criminal Act. I also agree with the majority that both Gross's confession and the DNA evidence linking him to the firearm are sufficiently attenuated from his unlawful seizure by Officer Williams to dissipate any taint from that police action.

I cannot agree, however, with a legal rule which holds that the unexpected discovery of an outstanding arrest warrant cannot be considered in the analysis of "whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *United States v. Crews*, 445 U.S. 463, 471 (1980). Rather, where there is no evidence that discovery of an outstanding arrest warrant was the purpose of the unlawful seizure, the incidental discovery of the warrant is an intervening circumstance that should be weighed in the attenuation analysis. Its impact on attenuation, of course, will depend on the particular circumstances in each case.

The material circumstances of this case demonstrate such attenuation. Even given that the officer stopped Gross without reasonable suspicion, he discovered Gross's arrest warrant only after he observed Gross in violation of state open-container laws. Gross was then arrested, processed at the jail, and, after four hours, a weapon was found in the jail cell that was later linked to Gross by DNA evidence. Under these circumstances, I would hold that the evidence of the gun was sufficiently attenuated from the original stop to be admissible against Gross. I therefore respectfully dissent.

**I.**

Although the underlying rationale of the exclusionary rule is the deterrence of unlawful government behavior, the Supreme Court has explained that "'[w]hether the exclusionary sanction is imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006) (quoting *United States v. Leon*, 468 U.S. 897, 906 (1984)) (internal quotation marks omitted). The Supreme Court has therefore "declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Ceccolini*, 435 U.S. 268, 276 (1978) (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)). "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (quotation marks and citation omitted).

Accordingly, we must determine whether "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon the evidence by the original illegality." *Crews*, 445 U.S. at 471. In doing so, we must consider all circumstances relevant to attenuation, including "the length of time between the illegal seizure and the [confession], the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his *Miranda* rights before he [confessed]." *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003) (citing *Kaupp v. Texas*, 538 U.S. 626, 632–33 (2003), and *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). No single fact in this analysis, however, is dispositive of attenuation. *Brown*, 422 U.S. at 603.

A.

While we have not previously considered whether the *unexpected* discovery of a valid arrest warrant may serve to dissipate the taint of an unlawful detention, we have considered closely analogous circumstances. First, we have held that if a suspect's response to an illegal stop is a new and distinct crime, such as flight, any evidence recovered incident to the arrest for that crime is not tainted by the unlawfulness of the initial detention. *United States v. Castillo*, 238 F.3d 424, 2000 WL 1800481, at *5–6 (6th Cir. Nov. 28, 2000) (unpublished table opinion); *United States v. Jefferson*, 182 F.3d 919, 1999 WL 519298, at *4 (6th Cir. July 15, 1999) (unpublished table opinion). In both *Castillo* and *Jefferson*, we concluded that where officers have probable cause to arrest a suspect on a new and independent basis, the lawful arrest authorized the officers to search the defendant, and the evidence seized as a result was admissible. *Castillo*, 2000 WL 1800481, at *5–6; *Jefferson*, 1999 WL 519298, at *4.

Second, in *United States v. Hudson*, 405 F.3d 425, 438 (6th Cir. 2005), we confronted the circumstance in which the police were looking for a particular suspect with a known and outstanding arrest warrant. They observed a car driven by the suspect's girlfriend with two passengers inside who loosely matched a race-based profile of the suspect. *Id*. The police effectuated a *Terry* stop, discovered Hudson and removed him from the car, and a search of his person revealed illegal drugs. *Id.* at 429. His identity as the suspect with the outstanding arrest warrant was then confirmed. *Id*. After we determined that the stop was unlawful because there was no reasonable suspicion to believe Hudson was in the car, we suppressed the drugs found on Hudson. We noted that "when the police make an illegal stop for the very purpose of arresting the person stopped, they are thereby exploiting the illegal stop in a manner prohibited by the Fourth Amendment and the evidence obtained in a pat-down of the arrested suspect or in a search incident to the arrest must be suppressed." *Id.* at 440. In our analysis, we looked to a line of Seventh Circuit cases involving the very issue before us here. *Id.* (discussing *United States v. Green*, 111 F.3d 515, 520–23 (7th Cir. 1997), and *United States v. Johnson*, 383 F.3d 538, 546 (7th Cir. 2004)).

In *Green*, the Seventh Circuit upheld the admission of evidence obtained during the search of a car incident to an arrest on an outstanding, previously-unknown arrest warrant discovered during a warrant check following an illegal seizure.  111 F.3d at 520–23.  The court reasoned that the officers' incidental discovery of the outstanding warrant "constituted an intervening circumstance sufficient to dissipate any taint caused by the illegal automobile stop."  *Id.* at 521.  This was because, in the Seventh Circuit's view:

> It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant—in a sense requiring an official call of "Olly, Olly, Oxen Free."  Because the arrest is lawful, a search incident to the arrest is also lawful.

*Id.*[1]  The Seventh Circuit subsequently reaffirmed this analysis is *Johnson*.  383 F.3d 538, 546 (7th Cir. 2004).

In *Hudson*, we approved of this analysis and "agree[d] with the Seventh Circuit that the admissibility of evidence obtained in an illegal stop depends on the *purpose* of the stop."  405 F.3d at 440.  We concluded that where the purpose of the illegal stop was from its very inception to arrest a suspect with an outstanding warrant, the evidence obtained pursuant to an immediate search incident to that arrest must be suppressed.  *Id.* at 440–41.  Essential to this conclusion, and evident from our discussion of *Green* and *Johnson*, of course, is the notion that where the arrest warrant is previously known to police and serves as the express basis for an unlawful stop, the warrant is not an *intervening* cause for the discovery of evidence.  Rather, it is the primary cause and is fully intertwined with the primary taint.  *See Hudson*, 405 F.3d at 440 ("[T]he officers' purpose in this case was clear: to arrest Hudson.  This they achieved, but only by exploiting a stop unsupported by reasonable suspicion.").

---

[1]The Seventh Circuit found confirmation of this view in case law from the Fifth, Eighth, and Eleventh Circuits.  *See United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir. 1971); *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995); *United States v. Bailey*, 691 F.2d 1009, 1018–19 (11th Cir. 1982).

The majority's statement that "[a]lthough both *Green* and *Johnson* are cases in which the Seventh Circuit held that the discovery of a warrant during an illegal stop constituted an intervening circumstance, in *Hudson*, we relied on *Green* only to emphasize that the purpose of an illegal stop or search is determinative of whether the fruits of the search will be suppressed," is nothing short of baffling. (Maj. Op. at 12–13.) Our discussion of *Green* and *Johnson* most certainly considered the question of whether an arrest warrant could serve as intervening circumstance; we sought to distinguish *Green* and *Johnson* on the very basis that the Hudson's arrest warrant was known *prior* to the illegal stop. *Hudson* itself makes this point unmistakably:

> The [*Green*] court reasoned that the officers' incidental discovery of the outstanding warrant "constituted an intervening circumstance sufficient to dissipate any taint caused by the illegal automobile stop." [111 F.3d] at 521. The court explained why the search incident to the valid arrest was sufficiently purged of the primary taint, i.e., the illegal stop:
>
> > In this case, while the police inappropriately stopped the Greens, *the purpose of the stop was not to seek evidence against the Greens*, but to obtain evidence against Mark Williams [the fugitive] . . . . *Nor did the police exploit the stop in order to search the automobile. Rather the search came only after they learned that Avery was wanted on a warrant and arrested him* . . . . Our conclusion that the evidence is admissible in this case also will not lessen the deterrent effect of the exclusionary rule on unconstitutional automobile stops because the general rule of exclusion is unchanged. It is only in the unusual case where the police, after a questionable stop, discover that an occupant is wanted on an arrest warrant that the intervening circumstances exception will apply.
>
> *Id.* at 523 (emphases added). A more recent pronouncement from the Seventh Circuit reaffirms this analysis. *See United States v. Johnson*, 383 F.3d 538, 546 (7th Cir. 2004) (holding that because the officers discovered valid warrants only after they illegally stopped the defendant, the search and arrest of the defendant could not be deemed the purpose of the stop). As these decisions indicate, when the police make an illegal stop for the very purpose of arresting the person stopped, they are thereby exploiting the illegal stop in a manner prohibited by the Fourth Amendment and the evidence obtained in a pat-down of the arrested suspect or in a search incident to the arrest must be suppressed.

405 F.3d at 440.  Thus, *Hudson* expressly recognized that an incidentally discovered arrest warrant could attenuate the taint from an unlawful stop.[2]  We ultimately held that where the purpose of the stop was, from its very inception, to arrest a suspect with a known warrant, the evidence obtained incident to that arrest must be suppressed.

It therefore follows that, where the purpose of the illegal stop is entirely unrelated to the arrest of a particular individual—here, the purpose was the investigation of an unusual circumstance encountered on patrol—a lawful arrest upon the subsequent *incidental* or *unexpected* discovery of an outstanding warrant is an intervening circumstance that weighs strongly toward attenuation.  *See Johnson*, 383 F.3d at 546 (holding that because the officers discovered valid warrants only after they illegally stopped the defendant, the search and the arrest of the defendant could not be deemed the purpose of the stop); *United States v. Simpson*, 439 F.3d 490, 495–96 (8th Cir. 2006) (concluding that an "outstanding arrest warrant constitutes an extraordinary intervening circumstances that purges much of the taint associated with" an illegal seizure).

There is even more reason to find attenuation in this case: the outstanding arrest warrant was discovered *only after Gross was observed in violation of the open-container law*.  Just as a suspect's flight from unlawful detention provides probable cause for police to arrest and search the suspect, so too does the discovery of an outstanding arrest warrant which follows from the observation of a crime completely unrelated to the illegal stop.  The combination of these intervening circumstances—Williams viewing

---

[2]The *dicta* from *United States v. Williams*, 615 F.3d 657, 670–71 (6th Cir. 2010), cited by the majority does not change this fact.  In *Williams*, special-duty police officer approached a small group of individuals standing in front of an affordable-housing complex.  *Id.* at 662.  One of the officers recognized Williams as a non-resident and told him that he was again trespassing on the housing-complex property.  *Id.*  He then asked Williams if there were any outstanding warrants for his arrest, and Williams responded that he thought there might be one outstanding.  *Id.*  The officer asked if Williams was armed, and the response lead the officer to believe he was in fact armed.  *Id.*  The officer then performed a pat-down search, discovered a concealed firearm, and arrested Williams.

We affirmed the suppression of the firearm because "the information obtained [through the officer's questioning] was not 'the product of free will under *Wong Sun*.'" *Id.* at 670 (quoting *Brown*, 422 U.S. at 603).  Though our discussion of the case included consideration of *Green*, *Johnson*, and *Hudson*, and we indeed commented that "we have never adopted the [the Seventh Circuit's] approach as the law of this circuit," our holding rested solely the fact that the officer "obtained his information by asking Williams a question during an illegal encounter in which a person would not feel free to leave or to refuse to answer questions." *Id.*  The facts in *Williams*—the officer recognized Williams, asked about warrants and weapons, and discovered the weapon immediately after Williams indicated that he may have a weapon—readily distinguish it from *Hudson* or the case at bar.

the open-container violation and then running a positive warrant check—transformed what had been an unlawful encounter with police into a lawful arrest and detention on an unrelated charge.[3]  And, "[p]ursuant to this lawful arrest, the officers were authorized to search [Gross], and the evidence seized as a result of the search is admissible." *Jefferson*, 1999 WL 519298, at *4.  The evidence obtained here—a firearm discovered on the jail-cell floor following Gross's removal to jail—would likewise be admissible.

The majority relies on two cases from our sister circuits to support its view that the discovery of an outstanding arrest warrant during an unlawful stop cannot constitute a intervening circumstance.  Neither, however, can be read to support the broad exclusionary principle announced today.  In *United States v. Lopez*, 443 F.3d 1280 (10th Cir. 2006), police officers approached two men standing in the street in the early morning, asked for identification, and then took the identification to the patrol car where a warrant check revealed that Lopez had an outstanding warrant for harboring a minor. *Id.* at 1282.  Lopez was subsequently arrested, and a search incident to his arrest uncovered drugs and a firearm.  *Id.*  The Tenth Circuit, affirming the suppression of the evidence, held that because the officer "did not have probable cause or reasonable articulable suspicion to detain Lopez until the warrants check was completed, . . . the seizure violated the Fourth Amendment."  *Id.* at 1286.  The court concluded that while the initial request for identification was consensual, the prolonged detention for the purpose of executing a warrant check was unreasonable.  *Id.* at 1285–86.  These circumstances are quite different than those in the case before us.  Rather than unexpectedly discovering an outstanding arrest warrant following a stop unrelated to the warrant, the police seized Lopez *for the very purpose of running a warrant check*.  There is no evidence in the record here, however, that Williams intended to run a warrant check on Gross before he discovered Gross in violation of the open-container law.

*United States v. Luckett*, 484 F.2d 89 (9th Cir. 1973) (*per curiam*), is similarly distinguishable.  There, a jaywalker was asked to produce identification so that officers

---

[3]The majority asserts that "Gross's arrest was not based on any action initiated by Gross himself." (Maj. Op at 13 n. 5.)  Williams's observation that Gross was in violation of the open-container law belies this contention.

could execute a traffic citation. *Id.* at 90. Following the citation, however, the police detained Luckett, ran a warrant check, and discovered an outstanding traffic warrant. *Id.* A subsequent search incident to Luckett's arrest on that warrant revealed a package of counterfeit money orders. *Id.* The Ninth Circuit affirmed the suppression of the evidence, holding that "because [the officers] had no reasonable grounds to be suspicious that there might be a warrant outstanding against [Luckett], this continued detention was unreasonable, and its fruits . . . were properly suppressed by the district court." *Id.* at 91. It concluded that because the prolonged detention "was done for the sole reason that [Luckett] lacked a driver's license" and occurred after the citation was issued for the observed infraction, the length and scope of detention was no longer "'strictly tied to and justified by' the circumstances which rendered its initiation permissible.'" *Id.* at 90–91 (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)). In the case before us, however, Officer Williams ran a warrant check immediately upon observing Gross in violation of the open container law. And although we have concluded that the placement of Williams's car rendered the initial investigation of Gross unreasonable under the circumstances, *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009), Williams's decision to run a warrant check upon viewing the open-container violation was not itself an unreasonable police act. The brief detention, which occurred for purposes of running the warrant check, was therefore both tied to and justified by the observed infraction.

A finding of attenuation is also supported by majority's conclusion that "the purpose and flagrancy of Williams's actions do not weigh heavily in the attenuation determination." (Maj. Op. at 16.) With respect to purpose, it is clear that Officer Williams sought to investigate an unusual situation that he encountered late at night: a running car in a parking lot with no driver and a passenger slumped down in the front seat. But a police officer's desire to investigate unusual circumstances encountered while on patrol is not necessarily a suspect purpose. *See See*, 574 F.3d at 315 (Gilman, J., concurring) ("Officer Williams had every right to investigate further, but he should have simply parked his patrol car alongside See's vehicle to carry out the investigation in a consensual manner."). Indeed, the majority concedes, as it must, that "there is not sufficient evidence in the record to show that Officer Williams 'knew [he] did not have

probable cause.'" (Maj. Op. at 16 (quoting *United States v. Shaw*, 464 F.3d 614, 630 (6th Cir. 2006)).) Nor did the officer stop Gross "in the hope that something might turn up." *Brown*, 422 U.S. at 605. And when Williams encountered the violation of the open-container law, it was perfectly reasonable to expect that he would investigate further and check if the suspect had any outstanding warrants. Nothing about that act indicates that Williams specifically targeted Gross for further investigation for anything other than an observed infraction.

Furthermore, Williams's unlawful stop in this case was not the type of flagrant act that can overcome the significant attenuation created by the timing and intervening circumstances discussed above. While it is true that Williams had once before blocked in a car in a similar manner, it was not until our recent decision in *See*, filed after the events in this case, that it would have been clear to Williams that his methods were decidedly an investigatory stop and not a consensual encounter. *See*, 574 F.3d at 313. Nothing in the record demonstrates that Williams's actions had the "quality of purposefulness," *Shaw*, 464 F.3d at 631, to specifically investigate Gross in the hope that something would turn up. Rather, it appears that Williams investigated an unusual situation on patrol, executed an unsupported *Terry* stop, and only upon discovering an ongoing violation of law ran a warrant check on the detained suspect. It is also important to reiterate that the unlawful police action in this case was Williams's blocking Gross's car rather than engaging in a consensual encounter, and not his act of running a warrant check upon observing a violation of an open-container law. The act of blocking the car to investigate the appearance of unusual circumstances, without more, is not the type of flagrant conduct that might serve to taint evidence discovered under such attenuated circumstances as we have before us.

Given those circumstances, there is sufficient attenuation between the initial unlawful seizure of Gross and the discovery of a firearm on the jail-cell floor. The presence of intervening circumstances in the form of an open-container violation and the subsequent discovery of an outstanding arrest warrant, the lack of evidence of unlawful

purpose or flagrant conduct, and the circumstances by which the evidence was discovered well after arrest all favor application of the attenuation doctrine in this case.

B.

The broad legal rule announced by the majority today is unmoored from precedent and expands the exclusionary rule to cover factual circumstances far removed from the core purposes of the Fourth Amendment.

As an initial matter, the majority's conclusion that the discovery of an outstanding warrant cannot be an intervening cause or circumstance is incorrect purely as a matter of logic. An intervening cause is "[a]n event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury." Black's Law Dictionary (8th ed. 2004). The observation of a criminal violation followed by the unexpected discovery of an arrest warrant, prior to the arrest and search of a suspect, clearly falls within this definition. Our task, therefore, is to determine whether these particular intervening causes, based on the all relevant circumstances, have interrupted "the chain of causation proceeding from the unlawful conduct . . . so as to remove the 'taint' imposed upon that evidence by the original illegality." *Crews*, 445 U.S. at 471.

The majority suggests that a rule permitting the consideration of the intervening discovery of an outstanding arrest warrant would encourage a new form of police investigation, under which police officers routinely seize individuals to check for outstanding warrants. It therefore appears that the constitutional violation which concerns the majority is the act of unlawfully seizing individuals *so that a warrant check might be run*. But *Hudson* squarely addresses this concern with its holding that evidence will be excluded where the officer's initial investigatory purpose relates to an outstanding warrant. And while an officer's subjective motivation is irrelevant in the determination of whether investigatory stop is constitutionally reasonable, *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010), the officer's purpose *is* relevant to the determination of whether the evidence has been purged of "taint" by intervening circumstances. Indeed, the majority emphasizes that a key to our attenuation doctrine

jurisprudence is precisely the *purpose of the stop*, but then proceeds to ignore this binding precedent. (Maj. Op. at 13 ("Under *Hudson*, therefore, where the purpose of an illegal stop is to arrest a suspect with an outstanding warrant, the evidentiary fruits of that stop must be suppressed; just as it was prior to *Hudson* in previous cases applying the attenuation doctrine, purpose is a factor in determining whether evidence should be purged of its primary taint.").) In the case before us there is no evidence that Williams's investigation of Gross had, from the outset, the purpose of seizing Gross in order to run a warrant check. Rather, a warrant check was run by Williams precisely because he observed Gross in violation of an open-container law.

The majority further argues that looking to the purpose of the stop would encourage officers to offer alternate reasons for the stop, thereby "creat[ing] a system of post-hoc rationalization." (Maj. Op. at 15.) But the exclusionary rule by its very nature requires a post-hoc review of the circumstances surrounding the discovery of evidence. Where there is evidence that a police officer unlawfully stopped an individual for the purpose of a warrant check, the evidence obtained following arrest may justifiably be excluded. But where, as here, there is no evidence in the record that the initial purpose of the stop was a warrant check, the unexpected discovery of a warrant upon the observation of a criminal violation may serve to dissipate the taint of an unlawful initial seizure.

## II.

For the foregoing reasons, I would conclude that the evidence against Gross is sufficiently attenuated from the initial illegality such that exclusion is unwarranted. Accordingly, I would affirm the district court's denial of Gross's motion to suppress.